**UNITED STATES of America, Appellee,**

v.

**WALLACH, et al., Defendants,**

**Rusty Kent London, Eugene Robert Wallach, a/k/a "E. Robert (Bob) Wallach," and Wayne Franklyn Chinn, Defendants–Appellants.**

Nos. 181–183, Dockets 89–1544, 89–1563 and 89–1575.

United States Court of Appeals, Second Circuit.

Argued Oct. 23, 1990.

Decided May 31, 1991.

As Amended Aug. 13, 1991.

Robert H. Bork, Washington, D.C. (Robert J. Giuffra, Jr., New York City, Gregory E. Maggs, Washington, D.C., Ellen Yaroshefsky, New York City, Dennis P. Riordan, Riordan & Rosenthal, San Francisco, Cal., Gary P. Naftalis, David S. Frankel, Robert A. Culp, Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), for defendant-appellant Eugene Robert Wallach.

Michael E. Tigar, Austin, Tex., for defendant-appellant Rusty Kent London.

Ted W. Cassman, Emeryville, Cal. (Penelope M. Cooper, Cristina C. Arguedas, Cooper, Arguedas & Cassman, Emeryville, Cal., of counsel), for defendant-appellant Wayne Franklyn Chinn.

Baruch Weiss, Elliott B. Jacobson, Asst. U.S. Attys., S.D.N.Y., New York City (Otto G. Obermaier, U.S. Atty., Steven A. Standiford, Debra Ann Livingston, Helen Gredd, Asst. U.S. Attys., S.D.N.Y., New York City, of counsel), for appellee U.S.

Before MESKILL and ALTIMARI, Circuit Judges, and KEENAN,* District Judge.

MESKILL, Circuit Judge:

This appeal presents several questions, the dispositive one being whether the perjured testimony of a key government witness requires a reversal of the convictions. The appellants seek to overturn judgments of conviction entered in the United States District Court for the Southern District of New York, following a sixteen week jury trial, Owen, *J.*, presiding. The jury returned verdicts against co-defendants Eugene Robert Wallach (Wallach), Rusty Kent London (London) and Wayne Franklyn Chinn (Chinn). Wallach was convicted of engaging in a pattern of racketeering activity, in violation of 18 U.S.C. § 1961 *et seq.*, two counts of interstate transportation of stolen property, in violation of 18 U.S.C. §§ 2314 and 2, and one count of conspiracy to violate the federal conflict of interest law and to defraud the United States, in violation of 18 U.S.C. § 371. London was convicted of one count of engaging in a pattern of racketeering activity, in violation of 18 U.S.C. § 1961 *et seq.*, one count of conspiracy to engage in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d), three counts of interstate transportation of stolen property, in violation of 18 U.S.C. §§ 2314 and 2, four counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, 18 U.S.C. § 2, and 17 C.F.R. § 240.10b–5, and one count of aiding and abetting false statements, in violation of 18 U.S.C. §§ 1001 and 2. Chinn was convicted of one count of engaging in a pattern of racketeering activity, in violation of 18 U.S.C. § 1961 *et seq.*, one count of conspiracy to engage in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d), two counts of interstate transportation of stolen property, in violation of 18 U.S.C. §§ 2314 and 2, five counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, 18 U.S.C. § 2, and 17 C.F.R. § 240.10b–5, and two counts of making false statements, in violation of 18 U.S.C. § 1001.

Wallach was sentenced to a total of six years imprisonment, fined $250,000, and ordered to forfeit $425,000. London was sentenced to a total of five years imprisonment, fined $250,000, and ordered to forfeit approximately $1.24 million. Chinn was sentenced to a total of three years impris-

---

* Honorable John F. Keenan, United States District Judge for the Southern District of New York, sitting by designation.

onment, fined $100,000, and ordered to forfeit approximately $1.16 million. Regarding these forfeiture amounts, the district court adjudged London and Chinn jointly and severally liable for $1.14 million of the total amount that each man was individually assessed.

Defendants attack their convictions on several grounds. We reverse all the convictions and remand for a new trial.

## BACKGROUND

The convictions subject to challenge stem from the defendants' dealings with the now defunct entity known as Wedtech Corporation (Wedtech). Over a period of years, each of the defendants engaged in a series of transactions with Wedtech. At trial, the government contended and the jury found in a number of instances that the conduct of each defendant constituted a criminal offense. Defendants concede that they engaged in transactions with Wedtech, but they submit that as a matter of law their convictions cannot be sustained. Defendants advance several theories to support their position. Due to the complexity of this case and to ease understanding of the issues presented, we assume the accuracy of the government's facts as they relate to the charges in the indictment. We, therefore, begin our discussion by outlining the government's version of the facts. The facts are developed further in connection with our discussion of the defendants' legal arguments.

### A. Facts

Wedtech began as a small metal parts manufacturer in the South Bronx, New York. During its infancy, Wedtech was known as the Welbilt Tool & Die Company (Welbilt). Welbilt was a privately held entity founded by John Mariotta, an individual of Puerto Rican descent. In 1975, Welbilt was accepted into the Small Business Administration's (SBA) "Section 8(a)" program, under which businesses owned by economically and socially disadvantaged minorities are eligible for government contracts without competitive bidding. In August 1983, Welbilt made a public offering of its stock and changed its name to Wedtech. (All subsequent references will be to Wedtech.)

Government contracts—primarily defense department contracts—were the lifeblood of Wedtech's economic survival. Most of these contracts were obtained under Wedtech's Section 8(a) status. In 1980, Wedtech sought to be awarded a Department of the Army contract for the production of small engines, but the Army and Wedtech could not agree to the financial terms of the contract. Wedtech officers concluded that the exercise of political influence might assist the corporation in obtaining the contract. To that end, Wedtech embarked on a lobbying effort.

In 1981, Wedtech officials were introduced to defendant Wallach, a lawyer and a close personal friend of Edwin Meese, III (Meese), then Counselor to President Ronald Reagan. After meeting the Wedtech officials, Wallach visited the company's facilities and agreed to assist the company in obtaining the sought-after defense contracts by contacting his friend Meese. From May 1981 until the end of 1984, Wallach sent several memoranda to Meese or his subordinates regarding the award of the small engine contract and other Wedtech matters. Ultimately, in September 1982, the Army awarded the small engine contract to Wedtech at a contract price of approximately $27 million. Wallach reported to the Wedtech officers that his efforts were primarily responsible for the contract award. During this lobbying effort, Wallach received no compensation from Wedtech, although he was reimbursed for his expenses.

Throughout his relationship with Wedtech, Wallach often dealt with Mario Moreno (Moreno) and Anthony Guariglia (Guariglia). Moreno, who originally joined Wedtech in 1978 as a consultant, became an officer in 1981 and eventually rose to become vice-chairman of Wedtech's board of directors. Guariglia, a certified public accountant, joined Wedtech in May 1983 as vice-president and controller. Guariglia went on to become Wedtech's president and a member of its board of directors.

Given his apparently successful lobbying effort on the small engine contract, Wallach, in late 1982, approached Wedtech officials and requested $200,000 as payment for his continued services during the last few months of 1982 and for services he would render in 1983. In December 1982, Wallach sent a proposed consulting agreement to Wedtech. Wedtech officers advised Wallach that the company was experiencing financial problems and that the agreement would not be executed until the company's financial situation improved. As an alternative, in March 1983, Wedtech officers promised to give Wallach one percent of the corporation's stock; Wedtech planned to make an initial public offering (IPO) of its stock later that year. Wallach continued his relationship with Wedtech and assisted the company with its plans to go public. Wedtech, in need of working capital in the months preceding the IPO, sought and obtained a $3 million bridge loan from Bank Leumi Trust Company (Bank Leumi). As a condition of this loan, Bank Leumi insisted that Wedtech's other creditors agree to subordinate their rights to ensure that Bank Leumi would be protected in the event of Wedtech's default.

One of the creditors, the Economic Development Agency (EDA), an agency within the Department of Commerce, refused to subordinate its priority position. In response, Wallach initiated a new lobbying effort directed at securing EDA's agreement. Wallach enlisted the assistance of Meese and members of his staff in an effort to obtain EDA's cooperation. In July 1983, EDA agreed to the subordination. Wedtech obtained the necessary bridge loan from Bank Leumi and its IPO took place in August 1983.

1. *Wedtech's $125,000 Payment and Wallach's Letter*

After completion of the public offering, Wallach approached Wedtech officers and renewed his request for $200,000. Wallach, at Wedtech's request, agreed to accept $125,000 for his lobbying efforts. Wedtech officials then asked Wallach to submit a letter which would explain that the payment was for services rendered in connection with the public offering. On September 7, 1983, Wallach sent such a letter to Guariglia. That letter read as follows:

Dear Tony:

Congratulations to all upon the success of the public offering. It is well deserved.

As we discussed, my fee for consultation relative to the registration and public offering is $125,000.

It is a great privilege to work closely with you and your very estimable colleagues at Wedtech.

Wedtech rendered full payment on the same date. Attributing the payment to services provided in connection with the public offering enabled Wedtech to utilize a more favorable accounting treatment. Specifically, had the true purpose of the payment been accurately reported, Wedtech would have been required to report the full amount as an expense and to deduct it from the corporation's earnings for the year in which the payment was made. Attributing the payment to the public offering permitted Wedtech to capitalize the amount of the payment—thereby avoiding the need to deduct the entire amount as an expense in one tax year. Such treatment had the effect of inflating Wedtech's profits per share and resulted in the inclusion of false information in Wedtech's SEC filings.

2. *$300,000 Prepayment for 1985–86 and the UPSCO Letter*

In January 1984, Wedtech entered into a written agreement with Wallach for his consulting services. Wallach was to receive $150,000 per year to be paid quarterly. However, at Wallach's request the full sum was paid in February of 1984. In September 1984, Wallach and Wedtech officers entered into a verbal agreement whereby Wallach would receive $300,000 as a prepayment for services he was to render in the years 1985 and 1986. After discussions between the parties, it was agreed that Wallach would submit a letter attributing this payment to services performed in connection with Wedtech's acquisition of

a shipyard, the Upper Peninsula Shipbuilding Company (UPSCO), located in Michigan. UPSCO had been acquired by Wedtech during the summer months of 1984. On October 26, 1984, Wedtech issued to Wallach a check in the amount of $300,000. In a letter dated November 6, 1984, Wallach attributed the payment to services he performed in connection with the UPSCO acquisition. This letter read, in pertinent part, as follows:

Re: *Upper Peninsula Shipbuilding Company*

Dear Tony:

I am acknowledging receipt of the check which I have received from the Company. I am, of course, delighted to have played a role in assisting the Company's acquisition of this very desirable new venture. We all share substantial optimism about the increased potential which the remarkable facilities provide to Wedtech.

This letter, like the earlier "public offering letter," misrepresented the true basis for the payment and resulted in Wedtech's earnings being artificially inflated and in the filing of false reports with the SEC. Furthermore, the payment was structured in this manner after Wallach informed Guariglia and Moreno that he anticipated receiving an appointment to a position in the United States Department of Justice under his friend, then-Attorney General Meese. Wallach had advised Guariglia and Moreno that he wished to continue to lobby for Wedtech's interests while a full-time government officer.

Wallach never obtained a federal position. During 1984 and 1985, however, he continued his lobbying efforts for the benefit of Wedtech. Indeed, he played a role in assisting the company to obtain renewals of a Navy contract for the manufacture of pontoons—temporary piers for the loading and unloading of ships. The total value of these renewals was approximately $108 million.

### 3. *Wallach Introduces London and Chinn*

In April 1985, Wallach introduced defendants London and Chinn to the officers of Wedtech. London, a specialist in real estate and financial management, and Chinn, a financial analyst specializing in stocks, first met in 1978 and worked on a number of transactions together. London owned and did business through two corporate entities known as International Financial Consulting and Investments, Inc. (IFCI) and National Consulting and Management, Inc. (NCMI). Similarly, Chinn owned and acted through a corporation known as Financial Management International, Inc. (FMI).[1] Wallach believed that London and Chinn could assist Wedtech. A business relationship soon developed between Wedtech and these financial analysts. On June 10, 1985, Wedtech entered into a written retention agreement (Retention Agreement) with London and Chinn. In August of 1985, Chinn was made a director of Wedtech.

According to the terms of the Retention Agreement, London and Chinn were to provide financial advice and improve Wedtech's image in the investment community. In return, London and Chinn were each to receive 50,000 shares of Wedtech common stock and reimbursement for expenses. On June 19, 1985, London and Chinn entered into a second agreement with Wedtech's five main officers—John Mariotta, Fred Neuberger, Lawrence Shorten, Mario Moreno and Anthony Guariglia. Under this agreement, London and Chinn were to take steps to increase the value of Wedtech's stock. Ultimately, they were to sell the restricted stock that was held by the five officers. As compensation, the officers agreed to pay London and Chinn ten percent (10%) of any increase in the value

---

1. The indictment refers to Chinn's corporation as Financial Management International, Inc. (FMI). The government in its brief makes reference to a Chinn corporation named Financial Management and Consulting, Inc., yet utilizes the abbreviation FMI. Because we believe this second reference to be nothing more than a typographical error and in light of the language of the indictment, any reference in this opinion to FMI refers to Financial Management International, Inc.

of the stock above the then-market price of $13 per share. This second agreement became known as the "Ten Percent Agreement." Chinn later assigned his interest under this agreement to IFCI, London's corporation.

### a. Six Checks Totaling $99,999.98

Wallach, during the summer of 1985, had requested additional compensation for his lobbying services. Wedtech agreed to pay Wallach an additional $150,000, but due to a cash deficiency sought to structure the payment over time. To avoid making any payments to Wallach during a period when it was anticipated that he would be holding a federal government position, Wallach, London, Chinn, Guariglia and Moreno agreed to conceal the payments by having Wedtech pay the funds to IFCI.

In July of 1985, and continuing through January 1986, Wedtech made a series of payments to London's corporation, IFCI. Specifically, Wedtech issued one check in the amount of $58,333.33 and five others, each in the amount of $8,333.33—totaling $99,999.98. These payments were made in response to an invoice submitted by London which sought $150,000 for consulting services related to Wedtech's attempt to sell a tug barge system. The payments were made to IFCI to facilitate the funneling of Wedtech monies to Wallach. London would pay the taxes and then forward the balance in cash to Wallach. Because the invoice which London submitted characterized the $150,000 as relating to the sale of the tug barge—a capital asset—Wedtech accountants were able to capitalize, as opposed to expense, the costs, thereby artificially inflating Wedtech's income per share.

### b. December 1985 Agreement: Secondary Public Offering

In December 1985, Wedtech officers agreed to enter into an agreement with London to assist the corporation with its second public offering, scheduled for January 1986. The agreement called for London to receive $1 million as compensation for his services. Chinn was a silent party to this agreement. The purpose of the agreement was to get London and Chinn to create a demand for the newly issued stock by "parking" it. Additionally, London and Chinn were to pay $100,000 as a kickback to Guariglia to ensure their receipt of the $1 million. Wedtech officers also paid to London and Chinn $114,000 in related expenses. Thus, the total sum involved was $1.14 million. Finally, London, Chinn and Guariglia agreed that the $1 million would be paid to London's corporation, IFCI, and that, in turn, Chinn's share would be channelled to him via his corporation, FMI, and that Wallach was to receive a twenty percent share of the $1 million payment. This mode of disbursing the funds was adopted in order to avoid the SEC mandated disclosure of the payment to Chinn, a Wedtech director. The registration statement that was filed in connection with the public offering made no mention of this $1.14 million payment. Similarly, the final prospectus that was mailed to shareholders omitted any reference to the payment. In the spring of 1986, Wedtech's outside counsel discovered that a payment had been made. Accordingly, a committee was organized to investigate the fee. In response to committee inquiries, London denied that he had shared the fee, and he attributed the payment to marketing services he allegedly had rendered and would continue to render in connection with a metallic coating process that Wedtech had developed. The committee eventually decided to characterize the fee to comport with this new explanation.

### 4. Wedtech's Final Days

In the summer of 1986, Wedtech's operations became the subject of numerous federal investigations. On December 26, 1986, Wedtech, finding itself unable to meet its financial obligations, filed for bankruptcy. On January 26, 1987, Moreno and Guariglia entered into cooperation agreements with the government, and on January 30, 1987, each man pleaded guilty to certain criminal charges. Moreno and Guariglia were the government's primary witnesses against the defendants, Wallach, London and Chinn.

## C. The Indictment

On October 17, 1988, Wallach, London and Chinn were charged in a twenty-one count Superseding Indictment: Count One charged all three defendants with engaging in a pattern of racketeering activity, in violation of 18 U.S.C. § 1961 *et seq.* Count Two charged all three defendants with a conspiracy to engage in the pattern of racketeering activity charged in Count One, in violation of 18 U.S.C. § 1962(d). These two RICO counts detailed six acts of racketeering. Racketeering Acts One and Two charged Wallach with fraudulently obtaining from Wedtech checks in the amount of $125,000 and $300,000, respectively, and transporting those checks in interstate commerce. Racketeering Act Three charged all three defendants with fraudulently obtaining from Wedtech six checks totaling $99,999.98 and transporting those checks in interstate commerce. Racketeering Act Four charged London and Chinn with defrauding Wedtech of $240,000 through an illegal kickback scheme that constituted mail fraud, commercial bribery and securities fraud. Racketeering Act Five charged London and Chinn with fraudulently obtaining from Wedtech two checks totaling $1.14 million in a scheme that involved interstate transportation of the property taken by fraud, mail fraud, commercial bribery and securities fraud. Racketeering Act Six charged Chinn with committing mail fraud by fraudulently obtaining more than $20,000 in fictitious business expense payments from Wedtech.

Counts Three, Four, and Six through Eighteen charged one or more of the defendants with substantive offenses that mirrored the six racketeering acts charged in Count One. Count Five charged all three defendants with conspiring to defraud the United States of Wallach's honest and faithful services and to violate 18 U.S.C. § 203, the federal conflict of interest statute, by agreeing to prepay Wallach for services he was to render on behalf of Wedtech while a full time government employee, all in violation of 18 U.S.C. § 371. Count Nineteen charged Chinn with making false statements on a Form S-1 (Registration Statement) filed with the SEC, in violation of 18 U.S.C. § 1001. Count Twenty charged London with aiding and abetting Chinn's filing of the Form S-1 false statements, in violation of 18 U.S.C. §§ 1001 and 2. Count Twenty-one charged Chinn with making false statements on a "personal financial statement" filed by Wedtech with the Small Business Administration, in violation of 18 U.S.C. § 1001.

## D. The Verdict

After a sixteen week trial, the jury began its deliberations on August 2, 1989. On Saturday, August 5, 1989, the fourth day of deliberations, juror number nine called in sick. Judge Owen, after speaking with the sick juror, directed that the remaining eleven jurors continue their deliberations pursuant to Fed.R.Crim.P. 23(b). On August 8, 1989, the eleven member jury returned its verdicts.

### 1. *Eugene Robert Wallach*

Wallach was convicted on Count One (substantive RICO), on Counts Three and Four (interstate transportation of two fraudulently obtained checks), and on Count Five (conspiracy to violate the conflict of interest law and to defraud the United States). He was acquitted on Count Two (RICO conspiracy) and Count Six (interstate transportation of checks totaling $99,999.98). In connection with his conviction on Count One (substantive RICO), the jury found Racketeering Acts One and Two (interstate transportation of two checks) to have been proven, but not Act Three (interstate transportation of checks totaling $99,-999.98).

Wallach was sentenced to concurrent terms of six years imprisonment on each of Counts One and Four, five years imprisonment on Count Five, and one year imprisonment on Count Three. The sentences imposed on Counts Three and Five were to run consecutively and to be served concurrently with the sentence imposed on Counts One and Four. Thus, the total term of imprisonment was six years. Wallach was also fined $250,000 on Count One and ordered to forfeit $425,000.

## 2. *Rusty Kent London*

London was convicted on Counts One (substantive RICO), Two (RICO conspiracy), Six (interstate transportation of checks totaling $99,999.98), Ten through Fifteen (interstate transportation of checks totaling $1.14 million and mail fraud), Seventeen (securities fraud), and Twenty (aiding and abetting false statements). He was acquitted on Counts Five (conspiracy to defraud the United States and to violate the conflict of interest law), Seven through Nine, and Sixteen. Regarding the RICO convictions, the jury found Racketeering Act Three and portions of Racketeering Act Five to have been proven but not Racketeering Act Four and portions of Act Five.

London was sentenced to concurrent terms of five years imprisonment on each of Counts One, Two, Six, Ten through Fifteen, Seventeen, and Twenty. A fine of $250,000 was imposed on Count One and London was ordered to forfeit $1,239,-999.98. Judge Owen ordered that London and Chinn were jointly and severally liable for $1.14 million of the total amounts that each man had been ordered to forfeit.

## 3. *Wayne Franklyn Chinn*

Chinn was convicted on Counts One (substantive RICO), Two (RICO conspiracy), Ten through Fifteen (interstate transportation of checks totaling $1.14 million and mail fraud), Seventeen through Nineteen, and Twenty-one (false statements). He was acquitted on Counts Five through Nine and on Count Sixteen. The jury found Racketeering Act Six and parts of Act Five to have been proven but not Racketeering Acts Three, Four and portions of Act Five.

Chinn was sentenced to concurrent terms of three years imprisonment on each of Counts One, Two, Ten through Fifteen, Seventeen through Nineteen, and Twenty-one. He was fined $100,000 and ordered to forfeit $1,160,133.39. The forfeiture order was subject to the same conditions of London's forfeiture order.

**2.** At the time of oral argument the charges against Guariglia had not been resolved. We have since been notified that Guariglia was con-

## DISCUSSION

The defendants collectively and individually advance numerous arguments attacking their convictions. To simplify the analysis, our discussion relates to all of the defendants unless otherwise noted.

### A. The Perjury Issue

The government's primary witnesses against the defendants were Moreno and Guariglia. Both men testified pursuant to cooperation agreements with the government. Because Moreno had perjured himself in a prior proceeding, the jury was instructed to evaluate his testimony carefully. No such instruction was given relative to Guariglia's testimony. These two witnesses provided the foundation upon which the prosecution built its entire case. They offered the only testimony that directly linked the defendants with the admittedly illegal conduct of Wedtech. Indeed, their testimony was, to say the least, critical to the government.

The defendants argue that their convictions must be reversed because Guariglia perjured himself during the course of his testimony at trial. The government concedes that Guariglia committed perjury. Indeed, on June 26, 1990, Guariglia was indicted and charged with committing perjury during the course of the trial of the instant case.[2] Guariglia's perjury related to his testimony on direct examination that he had stopped his compulsive gambling in the summer of 1988. Specifically, Guariglia testified that he had not gambled from the summer of 1988 to the time of the trial in June 1989. He further testified that he stopped gambling at the direction of prosecutors in the Southern District of New York and because he recognized that he was "hooked" on gambling.

On cross-examination, Guariglia admitted that he had signed gambling markers totaling $65,000 at the Tropicana, an Atlantic City casino, in September and October of 1988. Guariglia, however, continued to

victed on February 27, 1991, after a jury trial, of two counts of perjury committed during the course of the trial below.

maintain that he had not gambled on those occasions. On redirect, Guariglia offered an explanation for his drawing of the markers. Regarding the $15,000 in markers drawn on September 18, 1988, Guariglia testified that he drew the markers and cashed in the chips to pay off some previous markers which he believed he owed. He further stated that when he attempted to render payment he learned that no markers were outstanding and accordingly put the $15,000 in cash in his pocket. As to his conduct on October 26, 1988, Guariglia testified that he had signed markers and obtained chips in the amount of $50,000. He asserted, however, that he did not gamble. Instead, he stated that he gave the chips to a personal friend named Marshall Koplitz.

In response to Guariglia's testimony on redirect, the defendants proffered the testimony of John Copriviza, the assistant cage manager at the Tropicana Casino in Atlantic City. Defense counsel also disclosed to the government certain Tropicana records known as "player rating slips" which identified Guariglia as having placed bets on October 26, 1988. The government objected to the testimony of Copriviza and the introduction of the records under Fed.R. Evid. 608(b), arguing that the records and testimony were extrinsic evidence offered to impeach Guariglia's credibility and therefore subject to exclusion. The district court sustained the government's objection.

The question of Guariglia's perjury was again presented to the district court in the context of defendants' motion for a new trial. At that time the government conceded that Guariglia had committed perjury during the trial, but maintained that it learned of the perjury in December 1989, well after the completion of the trial. During the hearing of March 23, 1989, the government acknowledged that information establishing that Guariglia had gambled in Puerto Rico in November 1988 and that he had operated a stationery supply business illegally was obtained from an individual named Ira Cohen. Once the government corroborated this information,

Guariglia was arrested for violating the terms of his bail, and defense counsel were notified of the perjury.[3]

■ Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury. With respect to this latter inquiry, there are two discrete standards of review that are ultilized. Where the prosecution knew or should have known of the perjury, the conviction must be set aside " 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir.1982) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)); *see also Sanders v. Sullivan*, 863 F.2d 218, 225 (2d Cir.1988) (question is whether the jury's verdict "might" be altered); *Annunziato v. Manson*, 566 F.2d 410, 414 (2d Cir.1977). Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is "virtually automatic." *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975) (citing *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)), *cert. denied*, 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). Where the government was unaware of a witness' perjury, however, a new trial is warranted only if the testimony was material and "the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Sanders*, 863 F.2d at 226; *see also United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir.1975) (The test " 'is whether there was a significant chance that this added item, developed by skilled counsel ... could have induced a reasonable doubt in the minds of enough of the jurors to avoid a conviction.' ") (citations omitted).

Here, in an opinion and order dated April 11, 1990, the district court concluded that it

---

**3.** Assistant United States Attorney Baruch Weiss filed an "Affirmation" in response to the defendants' new trial motion which outlined the information that was learned from Mr. Cohen and the steps that the government took in response thereto.

was unnecessary to hold an evidentiary hearing to determine whether when Guariglia testified the government knew that he was lying. The district court found that there was "neither allegation nor evidence that the prosecution had any knowledge" of Guariglia's perjury. Accordingly, the district court applied the more demanding standard adopted in *Sanders* and concluded that the perjurious testimony was immaterial to the guilt or innocence of the defendants and that the jury's decision would not have been different. The district judge stated:

> The testimony was not material: Guariglia's gambling and skimming did not bear on the defendants' guilt or innocence only on Guariglia's credibility. And here, these instances of falsehood would have been merely minor, cumulative additions to the massive mound of discredit heaped upon Guariglia over several days of both direct and cross-examination.

██ Defendants submit that the government was aware of the perjury and that the district court ignored the facts on this issue. According to defendants, the prosecution should have been aware of the perjury once Guariglia was cross-examined and admitted having purchased gambling chips at an Atlantic City casino on two occasions in the fall of 1988. Instead, the prosecution sought to rehabilitate the witness on redirect, permitting Guariglia to testify that he had bought the chips but that he had not gambled, even after defense counsel disclosed to the government written records from the Tropicana Casino reflecting that Guariglia had gambled. We agree with the defendants that the government should have been aware of Guariglia's perjury.

Although the record demonstrates that the prosecution did not "sit on its hands" after becoming aware that Guariglia may have perjured himself, we are not satisfied that the government properly utilized the available information. Confronted with Guariglia's admission that he had been to the Tropicana on two occasions during the fall of 1988, the government asserts, and we do not doubt, that it questioned Guarig-

lia extensively regarding these trips to Atlantic City. The government also contacted the individuals who purportedly were with Guariglia on those occasions and was advised that Guariglia had not gambled. Finally, the record indicates that the government made some effort to contact individuals at the Tropicana. The extent and nature of the last inquiry is unclear and the failure of the district court to conduct any inquiry on this point provides us with little assistance.

In light of Guariglia's acknowledged history of compulsive gambling, we believe that given the inconsistencies in his statements the government should have been on notice that Guariglia was perjuring himself. Yet, instead of proceeding with great caution, the government set out on its redirect examination to rehabilitate Guariglia and elicited his rather dubious explanation of what had happened. Defendants placed before the government and the court powerful evidence that Guariglia was lying. Although this information was not formally admitted into evidence, it nonetheless cast a dark shadow on the veracity of Guariglia's statements. We fear that given the importance of Guariglia's testimony to the case, the prosecutors may have consciously avoided recognizing the obvious—that is, that Guariglia was not telling the truth.

Guariglia was the centerpiece of the government's case. Had it been brought to the attention of the jury that Guariglia was lying after he had purportedly undergone a moral transformation and decided to change his ways, his entire testimony may have been rejected by the jury. It was one thing for the jury to learn that Guariglia had a history of improprieties; it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie. While the jury was instructed that Moreno was an acknowledged perjurer whose testimony should be weighed carefully, no such instruction was given relative to Guariglia's testimony. Accordingly, because we are convinced that the government should have known that Guariglia was committing perjury, all the convictions must be reversed.

Even assuming that the government had no knowledge of the perjury at the time of trial, we believe that reversal would still be warranted. The government acknowledges that it received additional information concerning the falsity of Guariglia's testimony in December 1989, months after the trial's conclusion. Specifically, the government learned that Guariglia had gambled in Puerto Rico in November 1988 and that he had been involved in another illegal scheme during the period of his cooperation with the government. This additional information in itself provides a sufficient basis for granting the defendants a new trial. We reach this conclusion cognizant that a motion for a new trial on the basis of newly discovered evidence " '[is] granted only with great caution ... in *the most extraordinary circumstances.*' " *Sanders*, 863 F.2d at 225 (quoting *United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir.1987)); *see Stofsky*, 527 F.2d at 243.

Where newly discovered evidence demonstrates that a principal government witness committed perjury, we must determine whether the jury "probably" would have altered its verdict had it known of the witness' false testimony. *Stofsky*, 527 F.2d at 246. In *Seijo*, 514 F.2d at 1357, a case involving newly discovered evidence of perjured testimony, we reversed a conviction on facts strikingly similar to those now before us. While *Seijo* involved prosecutorial neglect, its reasoning and analysis is nonetheless helpful to our resolution of the instant case. *See Seijo*, 514 F.2d at 1364.

In *Seijo*, a cooperating witness, when asked on cross-examination whether he had ever been convicted of a drug offense, answered untruthfully that he had never been convicted of such an offense. Although the prosecution had no reason to know that the response was untruthful at the time it was given, we, nevertheless, reversed the defendant's conviction.[4] In so doing, we emphasized that despite the presence of other impeaching material during the trial the disclosure of the witness' false statement would have had a tremendous impact on the jury's credibility assessment of the witness. *Id.*

In the instant case, the district court found the evidence of Guariglia's perjury inconsequential because it was merely cumulative, providing one more basis for challenging Guariglia's credibility. In *Seijo*, we rejected this same reasoning. We noted that the witness had been subjected to direct and cross-examination and that he had admitted cooperating with the government, using opium, and being addicted to and selling heroin. Despite these admissions, we concluded that his denial of a prior marijuana conviction had "a different and more serious bearing. In this aspect, *it cannot be said to constitute merely cumulative impeaching material.*" *Id.* at 1363 (emphasis added). As we emphasized: "The taint of [the] false testimony is not erased because his untruthfulness affects only his credibility as a witness. 'The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.' " *Id.* at 1364 (quoting *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177).

Subsequent to our decision in *Seijo*, we recognized that these same concerns merit careful attention even in situations where the government has not contributed to the error—either through neglect or intentional misconduct—in permitting a witness' perjury. *Stofsky*, 527 F.2d at 246. "[A] witness's credibility could very well [be] a factor of central importance to the jury, indeed every bit as important as the factual elements of the crime itself." *Id.* (citing *Seijo*, 514 F.2d at 1363–64) (other citations omitted). Therefore, we concluded: "Upon discovery of previous trial perjury by a government witness, the court should decide whether the jury probably would have altered its verdict if it had had the opportunity to appraise the impact of the newly-discovered evidence not only upon the factual elements of the government's case but also upon the credibility of the government's witness." *Id.*

Applying that analysis here, we conclude as a matter of law that had the jury been aware of Guariglia's perjury it probably would have acquitted the defendants. Guariglia's false testimony regarding his gambling directly calls into question the veracity of the rest of his statements. Guariglia's testimony was essential to the government's case; indeed, he tied all the pieces together. And, as we have emphasized, he was the only witness who the jury was led to believe had undergone a radical moral transformation. Moreover, the

---

4. The prosecutor in *Seijo* had no actual knowledge of the perjury. An FBI sheet noting the prior conviction had been sent to the prosecutor's office, but was misfiled; the prosecutor never saw it. *Seijo*, 514 F.2d at 1363. This mistake, while innocent, contributed to the trial error.

government through its redirect and in its closing argument made much of Guariglia's motive for telling the truth. One of the prosecutors stated in closing:

> The government submits to you that Mr. Moreno and Mr. Guariglia are credible witnesses and you should credit their testimony for a number of reasons. First of all, they have confessed to their crimes, they have admitted their crimes, and they have pleaded guilty to serious felony counts. They entered into cooperation agreements with the government and those agreements are in evidence. . . .
>
> You heard the terms of those agreements when they testified. If they perjured themselves, if they give false testimony in this trial, then the deal is off. They can be prosecuted for every crime they committed and everything they have said in interviews with the U.S. Attorney's office and every trial they have testified in their testimony can be used against them. *That I submit gives them a powerful motive to tell the truth when they testified at this trial.*

(emphasis added). While vouching for a witness' credibility alone is not ordinarily a basis for reversal, these comments provide one more reason to set aside the jury's verdict. In sum, we reverse the convictions because after reviewing the record we are left "with a firm belief that but for the perjured testimony, the defendant[s] would most likely not have been convicted." *Sanders*, 863 F.2d at 226 (applying the *Stofsky* probability standard).

Defendants advance numerous other challenges to their convictions. Although our decision on the perjury issue is itself a sufficient basis for disposing of these appeals, the likelihood of a new trial suggests that we should also address some of the other arguments urged by the defendants. We limit our analysis to those issues that directly challenge the validity of the indictment or the legal viability of the government's theory underlying any of the charges.

### B. The Indictments and the U.S. Attorney's Bias

The defendants challenge the authority and motives of the U.S. Attorney's Office for the Southern District of New York. Specifically, they offer two reasons in support of their contention that the indictment in this case was improperly obtained. First, they assert that the Independent Counsel (IC) appointed to investigate former Attorney General Edwin Meese had exclusive prosecutorial jurisdiction over the conduct that is charged in the underlying indictment. Second, defendants contend that the prosecutors were inherently biased because they wanted either to protect or to attack Meese. We find these claims to lack merit.

### 1. *The Independent Counsel*

Defendants argue that once the IC was appointed to investigate the conduct of then-Attorney General Meese, the U.S. Attorney's Office for the Southern District of New York was divested of jurisdiction over any matter that related to Meese without first obtaining written authorization from the IC pursuant to 28 U.S.C. § 597(a). Section 597(a) gives the IC exclusive prosecutorial jurisdiction over matters referred to him unless he otherwise agrees in writing.

On February 2, 1987, Independent Counsel James McKay was appointed pursuant to 28 U.S.C. § 593(b) to conduct an investigation of Franklyn Nofzinger and his relationship with Wedtech. On May 11, 1987, Deputy Attorney General Burns sent a letter to McKay requesting that he accept the referral of an investigation of Attorney General Meese. McKay accepted the referral and both the Department of Justice and McKay petitioned the Independent Counsel Court (ICC) for an order further defining McKay's responsibilities. On August 18, 1987, the ICC issued its order. It provided:

> Independent Counsel James C. McKay shall have jurisdiction to investigate ... whether ... any ... provision of the federal criminal law, was violated by *Mr. Meese's relationship or dealings at any time from 1981 to the present with any of the following: Welbilt Electronics Die Corporation/Wedtech Corporation ...; Franklin C. Nofzinger; E. Robert Wallach; W. Franklyn Chinn; and/or Financial Management International, Inc.*

(emphasis added). Defendants read this order and the Burns referral letter as having vested the IC with exclusive jurisdiction over their relationships with Wedtech. Thus, they argue when prosecutors from the Southern District of New York appeared before the Grand Jury on May 28 and 29, 1987, they did so without jurisdiction. Defendants stress that it was not until December 21, 1987, that the IC formally referred, pursuant to 28 U.S.C. § 597(a), the authority to indict to the Southern District.

Defendants' interpretation of the ICC's order directing the investigation of Meese fails to appreciate the order's plain language. It was only Meese's conduct that Independent Counsel McKay was charged with responsibility to investigate. By its terms, the order did not preclude other investigations of Wedtech, Wallach or Chinn. The government did not need the IC's authorization to seek an indictment in the Southern District of New York. The decision to approach the IC only indicates that the prosecutors did not want to disrupt or to infringe on any aspect of the IC's ongoing investigation of Meese. The Southern District prosecutors' prudence is not a basis for concluding that they lacked the requisite authority to act.

2. *Prosecutorial Bias and Conflict of Interest*

■ Defendants further argue that every Department of Justice (DOJ) prosecutor was inherently biased in some way due to the alleged involvement of the DOJ's top official, then-Attorney General Meese. Thus, the defendants submit, the U.S. Attorneys in the Southern District of New York were not "disinterested prosecutors" as required by the Due Process Clause. These sweeping arguments are completely lacking in merit. The only case law that defendants rely on to support their position involves individual prosecutors who were discovered to have had an actual interest in the outcome of a case. Additionally, the argument that every DOJ employee was somehow tainted because of the alleged involvement of Meese is incredible and simply the product of speculation. Defendants point to nothing that demonstrates the existence of any bias or prejudice. Finally, even assuming the existence of some bias, defendants have in no way established that they were prejudiced by any conflict of interest. *See Wright v. United States*, 732 F.2d 1048, 1056 n. 8 (2d Cir.1984) (extent of prejudice that must be shown depends on what stage proceedings have reached), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985).

C. The Mail Fraud Charges

1. *Counts Twelve Through Fifteen*

Counts Twelve through Fifteen charged London and Chinn with mail fraud in violation of 18 U.S.C. § 1341. Each of these counts also included a charge of aiding and abetting in violation of 18 U.S.C. § 2. The charges in Counts Twelve through Fifteen related to certain mailings made by London in furtherance of his purported scheme with Chinn to obtain $1.14 million from Wedtech. London and Chinn submit that these charges are legally insufficient because the government only alleges a fraudulent taking of intangible rights—interests that do not rise to the level of "property" within the meaning of the mail fraud statute.

The government's theory was that London and Chinn used the mails to further a scheme designed to funnel Wedtech funds to Chinn through his entity FMI, to pay a $100,000 kickback to Guariglia, and to pass a twenty percent share of the $1 million to Wallach. The alleged scheme began when Moreno and Guariglia agreed to pay London and Chinn $1 million for their services in connection with Wedtech's secondary public offering. Guariglia, in a side deal, was to receive a $100,000 kickback. The $1 million was to be paid from Wedtech to London's corporation, IFCI. London would then make a payment to Chinn's entity, FMI. The payment was structured in this fashion because Chinn was a director of Wedtech at the time; if he had received the payment directly, it would have to have been reported on SEC disclosures. After the offering was completed, Guariglia authorized an additional disbursement to London of $140,000 for expenses. Thus, the total sum involved was $1.14 million.

London sent an invoice to Wedtech attributing the $1.14 million fee to services rendered in connection with Wedtech's secondary public offering. The prospectus for the secondary public offering was mailed to Wedtech shareholders and failed to disclose that Chinn, a Wedtech director, was receiving part of the $1.14 million payment. Later, when the payments were discovered, London sent letters to Wedtech's outside

counsel which mischaracterized the purpose of the payments and the true recipients.

■■■ The federal mail fraud statute prohibits an individual from "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. The essential elements of a mail fraud violation are (1) a scheme to defraud, (2) money or property, and (3) use of the mails to further the scheme. *See McNally v. United States,* 483 U.S. 350, 356, 107 S.Ct. 2875, 2879, 97 L.Ed.2d 292 (1987); *United States v. Pisani,* 773 F.2d 397, 409 (2d Cir.1985). To establish the existence of a scheme to defraud, the government must present proof that the defendants possessed a fraudulent intent. *United States v. Schwartz,* 924 F.2d 410, 420 (2d Cir.1991); *United States v. Starr,* 816 F.2d 94, 98 (2d Cir.1987). And although money or property must be the object of the scheme, *McNally,* 483 U.S. at 358–59, 107 S.Ct. at 2880–81, the government is not required to show that the intended victim was actually defrauded. The government need only show that the defendants contemplated some actual harm or injury. *Starr,* 816 F.2d at 98; *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1180 (2d Cir.1970).

■■■ London and Chinn submit that Wedtech received services in return for the payments and that, therefore, the shareholders were not defrauded of any property. As we explain below in connection with our discussion of the charges under the National Stolen Property Act, 18 U.S.C. § 2314, providing alternative services does not defeat a fraud charge because the fact remains that the corporation and its shareholders did not receive the services that they believed were being provided. In addition, the defendants contend that the only property alleged to have been taken was the shareholders' intangible "right to control" how Wedtech's money was spent. They argue that the Supreme Court's holding in *McNally,* 483 U.S. 350, 107 S.Ct. 2875, precludes a mail fraud charge based

on the alleged taking of such intangible property rights. We disagree.

In *McNally,* the Supreme Court reversed a mail fraud conviction that was predicated on the charge that the defendant had defrauded the citizens of a state of their intangible right to "honest and impartial government." *Id.* at 355, 107 S.Ct. at 2879, *but see* 18 U.S.C.A. § 1346 (legislatively overruling *McNally*). London and Chinn maintain that Wedtech and its shareholders, like the citizens in *McNally,* were not deprived of any tangible property rights and, therefore, prosecution under the mail fraud statute is impermissible. Defendants misread the Supreme Court's opinion in *McNally.* Furthermore, defendants' definition of "property" is too narrowly drawn.

In *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the Supreme Court clarified its decision in *McNally.* The Court declared: *"McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." *Id.* 484 U.S. at 25, 108 S.Ct. at 320. Indeed, the Court recognized that its holding was quite specific: "We held in *McNally* that the mail fraud statute does not reach 'schemes to defraud citizens of their intangible rights to honest and impartial government,' and that the statute 'is limited in scope to the protection of property rights.'" *Id.* (citations omitted). In upholding a mail fraud conviction, the *Carpenter* Court recognized that the *Wall Street Journal*'s confidential business information—an intangible interest—constituted property within the statute's purview. *Id.* Thus, the central focus of our inquiry is whether under the government's theory any property right was taken or placed at risk of loss as a result of the defendants' alleged scheme; if no property right was involved, the mail fraud charges cannot survive.

The indictment charged that the victims of the alleged "scheme and artifice" were Wedtech and its shareholders who were defrauded of the $1.14 million in payments as well as the "right to control" how the money was spent. In addition, those who

purchased Wedtech stock as part of the secondary offering were alleged to be victims. London and Chinn maintain that these alleged victims were not deprived of any property right. The corporation and shareholders, according to London and Chinn, were in fact benefitted as a result of their efforts to enhance the value of the corporation's stock. Moreover, they claim that it is only the directors and officers of a corporation who are charged with the responsibility for managing the entity and that, therefore, the shareholders could not have been deprived of any property interest because they possess no "right to control" how corporate funds are spent.

■■■ At the outset, we recognize that a corporation can only act through its agents—officers and directors. It is the directors who are charged with the responsibility for managing the affairs of a corporation. *Diamond v. Oreamuno*, 29 A.D.2d 285, 287, 287 N.Y.S.2d 300, 302 (1st Dep't 1968), *aff'd*, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969). Generally, the role of shareholders in governing the conduct of the corporation is minimal and limited to fundamental decisions such as the election of directors or the approval of extraordinary matters like mergers, a sale of substantially all corporate assets, dissolutions and amendments of the articles of incorporation or the corporate bylaws. *See* R. Clark, *Corporate Law* § 3.1.1, at 94 (1986); *see also* N.Y.Bus.Corp.L. §§ 703, 903, 909 (McKinney 1991); 1 *Fletcher Cyclopedia of the Law of Private Corporations* § 30, at 553 (Perm. ed. 1990) (hereinafter *"Fletcher"*). Thus, the shareholders have no legal right to control the day-to-day affairs of a corporation. Moreover, shareholders do not hold legal title to any of the corporation's assets. Instead, the corporation—the entity itself—is vested with the title. 5A *Fletcher* § 2213, at 323. " [T]he corporation in respect of corporate property and rights is entirely distinct from the stockholders who are the ultimate or equitable owners of its assets.' " *5303 Realty Corp. v. O & Y Equity Corp.*, 64 N.Y.2d 313, 323, 486 N.Y.S.2d 877, 884, 476 N.E.2d 276, 283 (1984) (quoting *Brock v.*

*Poor*, 216 N.Y. 387, 401, 111 N.E. 229, 234 (1915)).

■■■ While shareholders have neither a right to manage the corporation nor a right to hold title to corporate property, their ownership of stock in the corporation is nonetheless a property interest. Although the stock certificates may be the only physical (tangible) manifestation of this property, the ownership interest that the certificates represent plainly is "property." "[S]hares of stock are property, but they are intangible and incorporeal property existing only in abstract legal contemplation." 11 *Fletcher* § 5097, at 92. There are, however, other incidents accompanying the property interest that a stockholder owns.

The government asserts that the actions taken by the defendants denied the shareholders the "right to control" how corporate assets were spent—an intangible property interest. The "right to control" has been recognized as a property interest that is protected by the mail fraud statute. *See, e.g., United States v. Biaggi*, 909 F.2d 662, 687 (2d Cir.1990) (Defense Department's right to control contract awards protected by mail fraud statute), *cert. denied*, ── U.S. ──, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991); *United States v. Shyres*, 898 F.2d 647, 652 (8th Cir.) (corporation deprived of right to control spending when officers awarded contracts to outside contractor and received a kickback), *cert. denied*, ── U.S. ──, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990); *United States v. Kerkman*, 866 F.2d 877, 880 (6th Cir.) (same), *cert. denied*, ── U.S. ──, 110 S.Ct. 95, 107 L.Ed.2d 59 (1989); *see also McNally*, 483 U.S. at 360, 107 S.Ct. at 2881 (suggesting that conviction may have been affirmed if jury had been "charged that to convict it must find that the Commonwealth [of Kentucky] was deprived of control over how its money was spent"). Despite the recurrent references to a "right to control," we think that use of that terminology can be somewhat misleading and confusing. Examination of the case law exploring the "right to control" reveals that application of the theory is predicated on a showing that some

person or entity has been deprived of potentially valuable economic information. *See United States v. Little,* 889 F.2d 1367, 1368 (5th Cir.1989) (concealment of economically material information can constitute mail fraud), *cert. denied,* —— U.S. ——, 110 S.Ct. 2176, 109 L.Ed.2d 505 (1990). Thus, the withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for a mail fraud prosecution.

A stockholder's right to monitor and to police the behavior of the corporation and its officers is a property interest. This incident of stock ownership represents one way that a shareholder can protect the value of his or her investment. The maintenance of accurate books and records is of central importance to the preservation of this property interest. "The stockholders' right of inspection of the corporation's books and records rests upon the underlying ownership by them of the corporation's assets and property" and is an incident of "ownership of the corporate property." 5A *Fletcher* § 2213, at 323. Indeed, given the important role that information plays in the valuation of a corporation, the right to complete and accurate information is one of the most essential sticks in the bundle of rights that comprise a stockholder's property interest.

The importance of this right to information is recognized by the statutes and rules that govern the operation of a publicly held corporation. Indeed, the officers of a publicly held corporation are legally obligated to keep and to maintain books and records which "accurately and fairly reflect the transactions and dispositions of the assets" of the corporation. 15 U.S.C. § 78m(b)(2)(A); 17 C.F.R. § 240.1362–1; *cf. United States v. Siegel,* 717 F.2d 9, 14 (2d Cir.1983) (mail fraud violation when "a fiduciary fails to disclose material information 'which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to the other'") (citations omitted). The provision of complete information protects a shareholder's investment—a clear property interest. In the event that a stockholder disagrees with a corporation's actions,

steps can be taken to prevent such further activity or the shares can be sold. When intentionally deprived of accurate information regarding how corporate assets are being spent, a shareholder's investment is placed at great risk. If corporate officers and directors, and those acting in concert with them, were free to conceal the true nature of corporate transactions, it is conceivable that the assets of the corporation could be so dissipated as to render a shareholder's investment valueless.

London and Chinn also submit that Wedtech and its shareholders received valuable services in return for the payments that were made, and therefore, the shareholders were not defrauded. The provision of alternative services does not defeat a mail fraud prosecution. As Judge Learned Hand eloquently explained many years ago in response to a similar argument:

> Civilly of course the action would fail without proof of damage, but that has no application to criminal liability. A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him. That is the evil against which the [mail fraud] statute is directed.

*United States v. Rowe,* 56 F.2d 747, 749 (2d Cir.), *cert. denied,* 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932).

■ Where, as here, it is alleged that London and Chinn, in concert with Wedtech insiders, set up a scheme to conceal the true nature of their dealings and the ultimate recipients of the payments, we conclude that a mail fraud charge can be sustained. By using the mails to submit false invoices and other inaccurate information, these defendants intentionally sought to misrepresent the nature of the transactions in which they were involved. These misrepresentations permitted the officers to pay out large sums from the corporation to undisclosed individuals for what were purportedly improper purposes, while main-

taining the facade that these payments were in furtherance of legitimate corporate goals. By concealing this information, the value of Wedtech stock was obscured and the shareholders and the corporation were deprived of the opportunity to make informed decisions.

■ Finally, we cannot accept defendants' argument that the directors and officers of the corporation have the authority to act on behalf of the shareholders and the corporation and that therefore a criminal fraud cannot be perpetrated when all the officers are participants in the scheme. Defendants would have us endorse a theory of criminal law that would effectively grant corporate officials and third-parties working in concert with them a license to loot the corporate treasury as long as they were all in on the scheme. We decline to do so. Such a theory completely fails to recognize and to protect the property interests of the shareholders and the corporation. As we have stated on a prior occasion, once a property right is found to exist, section 1341's language " ' "any scheme or artifice to defraud" is to be interpreted broadly.' " *United States v. Evans*, 844 F.2d 36, 40 (2d Cir.1988) (quoting *McNally*, 483 U.S. at 356, 107 S.Ct. at 2879); *see also Durland v. United States*, 161 U.S. 306, 313–14, 16 S.Ct. 508, 40 L.Ed. 709 (1896). As one member of our Court has noted in a different context, "[t]he issuance of checks falsely prepared to reflect the performance of non-existent services is a fraud on someone, ultimately the shareholders, who are deprived of an opportunity to know how corporate funds are being spent." *United States v. Weiss*, 752 F.2d 777, 794 (2d Cir.) (Newman, *J.*, dissenting), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). We accordingly conclude that the government advanced a viable theory of fraud under the mail fraud statute.

### 2. *Count Eighteen*

Count Eighteen charged Chinn individually with committing mail fraud in connection with his submission of credit card receipts for reimbursement. According to the government, Chinn had a side deal, which was approved by Guariglia and one other Wedtech official, whereby Chinn was permitted to spend up to $100,000 annually for personal expenses on his Wedtech corporate credit cards. During the thirteen month period from September 1985 through November 1986, Chinn utilized his Wedtech credit cards for his personal benefit by purchasing approximately $23,000 in goods and services. The indictment charged that the mail fraud occurred when Diners Club and American Express mailed monthly account statements to Wedtech for payment. Chinn attacks these charges on two grounds: (1) the mailings were made by the credit card companies not by Chinn, and (2) he reiterates the argument that no "property" protected by the mail fraud statute was taken. We do not find either argument to be persuasive.

In support of his first argument, Chinn argues that the Supreme Court's holdings in *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), and *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), demonstrate that such allegations cannot support a mail fraud charge. In *Parr*, the Court held that two employees who used their school district credit cards to obtain gasoline and other services for their personal use could not be prosecuted for mail fraud simply because the oil companies involved ultimately submitted the bills to the school district for payment. The Court reasoned that the mailings were not in furtherance of the scheme because the perpetrators had already gotten what they wanted. 363 U.S. at 392–93, 80 S.Ct. at 1184. Similarly, in *Maze*, the individual charged had stolen his roommate's credit card and proceeded to embark on a traveling spree. The *Maze* Court concluded that the subsequent mailing of the credit card billings could not provide a basis for conviction under the mail fraud statute because the success of the defendant's scheme in no way depended on the mailings. Indeed, as the Court noted, the mailings actually increased the probability that the defendant would be detected. 414 U.S. at 402–03, 94 S.Ct. at 649–50.

Despite the superficial similarity among the cases, we find the instant case distinguishable from *Parr* and *Maze*. Here, the government's theory was that Chinn had entered into an agreement with Guariglia and other Wedtech insiders, wherein Chinn's compensation would be increased by as much as $100,000 per year. The fundamental question is whether the mailings were "incident to an essential part of the scheme." *Parr*, 363 U.S. at 390, 80 S.Ct. at 1183 (quoting *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954)). Discussing the proper focus of such mail fraud challenges, the Supreme Court recently declared:

> We also reject [the] contention that mailings that someday may contribute to the uncovering of a fraudulent scheme cannot supply the mailing element of the mail fraud offense. The *relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time*, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud.... Those who use the mails to defraud proceed at their peril.

*Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 1449–50, 103 L.Ed.2d 734 (1989) (emphasis added).

■ We conclude that under the government's theory the credit card billings were central to the scheme and essential to its continued success. This was not to be a "one shot" proposition. *See id.* at 711, 109 S.Ct. at 1448. Rather, the intention of the scheme was to enhance Chinn's compensation by paying him periodically for personal expenses that he incurred. Such payments were to be made under the guise of reimbursements for business related expenses. Therefore, unlike the situations in *Parr* and *Maze*, the credit card billings not only were anticipated by Chinn, but also were essential to the success of the scheme. In *Parr* and *Maze*, the alleged perpetrators had no intention of continuing to communicate with the victims of their fraud. Here, however, the government's theory is that Chinn had expressly agreed with Guariglia that an additional $100,000 in compensation would be forthcoming through payments that would be disguised as reimbursements for business related expenses. Absent the regular credit card company mailings, Wedtech could not have treated these payments as reimbursements for business expenses and Chinn's ability to continue to receive the payments would have come to an end. It thus cannot be said that " '[t]he scheme ... had reached [its] fruition' " once Chinn received the goods and services which he charged on the Wedtech accounts. *Parr*, 363 U.S. at 393, 80 S.Ct. at 1184 (quoting *Kann v. United States*, 323 U.S. 88, 94, 65 S.Ct. 148, 150, 89 L.Ed. 88 (1944)). The government's theory underlying Count Eighteen is legally sufficient.

■ Likewise, Chinn's second argument that no "property" was taken lacks merit. As we previously explained, the intentional submission of inaccurate or incomplete billing invoices can provide the basis for a mail fraud prosecution. That reasoning is equally applicable here. Moreover, Chinn was a director of Wedtech at the time of these alleged improper payments. As such he owed a fiduciary duty to the corporation and its shareholders to disclose fully the true purpose of the payments he received. *See Siegel*, 717 F.2d at 14 (fiduciary's failure to disclose material information can provide basis for mail fraud violation). Instead, Chinn, with Guariglia's cooperation, concealed the payments by masking them as business expenses, thereby perpetrating a fraud on Wedtech and its shareholders.

### D. The National Stolen Property Act Charges

London, Wallach and Chinn were each charged with violating the National Stolen Property Act, 18 U.S.C. § 2314 (the Act) and with aiding and abetting violations of the Act, 18 U.S.C. § 2. Section 2314 prohibits the interstate transportation of "any goods, wares, merchandise, securities or money" valued at $5,000 or more by individuals who knew the property to have been "stolen, converted, or taken by fraud." 18 U.S.C. § 2314. Counts Three

and Four charged Wallach with violating the Act by transporting across state lines two checks in the amounts of $125,000 and $300,000, respectively. Count Six charged all three defendants with violating the Act by transporting a series of checks totaling $99,999.98 across state lines. Both Wallach and Chinn were acquitted of the charges in Count Six. Counts Ten and Eleven charged London and Chinn with violating the Act by transporting two checks totaling $1.14 million across state lines.

In relation to all these charges, the government's theory was that through misrepresentation and deception London, Wallach and Chinn defrauded Wedtech and its shareholders. The product of this fraud was the receipt of Wedtech property, namely, the face value of the checks. Specifically, the government alleged that the false invoice and the false letter submitted by Wallach, in connection with his receipt of the checks for $125,000 and $300,000, amounted to a "fraud" on Wedtech and its shareholders. Similarly, it was alleged that London and Chinn fraudulently obtained corporate funds by providing false and misleading information. These activities, the government charged, coupled with subsequent interstate transportation of the relevant checks, resulted in violations of the Act.

Defendants challenge the viability of these charges. Their arguments parallel, in large part, those advanced in connection with the mail fraud charges. We conclude, as we did with respect to the mail fraud charges, that the National Stolen Property Act charges are legally sufficient.

 To obtain a conviction under the National Stolen Property Act, the government must prove beyond a reasonable doubt the following elements: (1) the defendant transported property, as defined by the statute, in interstate commerce, (2) the property was worth $5,000 or more, and (3) the defendant knew the property was "stolen, converted or taken by fraud." *Dowling v. United States*, 473 U.S. 207, 214, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985); *see United States v. Vontsteen*, 872

F.2d 626, 630 (5th Cir.1989); *United States v. Stack*, 853 F.2d 436, 438–39 (6th Cir. 1988). The government charged that the defendants transported the Wedtech checks in interstate commerce knowing them to have been procured by fraud. While the definition of fraud is generally the same under the mail fraud statute, 18 U.S.C. § 1341, and under the Act, 18 U.S.C. § 2314, *see, e.g., United States v. Kibby*, 848 F.2d 920,˙922–23 (8th Cir.1988), there are two significant differences between the offenses. First, to establish a violation of section 2314 the government must prove that the defendant was actually successful in defrauding his intended victim of property in excess of $5,000—actual pecuniary harm must be shown. *United States v. Lennon*, 751 F.2d 737, 744 (5th Cir.), *cert. denied*, 471 U.S. 1100, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985). In contrast, to obtain a conviction under section 1341, the government need only prove an intent to defraud; actual success of the scheme to defraud is not an essential element of the crime. *See United States v. Gelb*, 881 F.2d 1155, 1162–63 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989). Second, to obtain a conviction under section 2314 the government need not prove that the defendant actually participated in the scheme to defraud someone of property; proof that the defendant *knew* the property to have been stolen or procured by fraud is sufficient. *Stack*, 853 F.2d at 439.

Defendants maintain, as they did with respect to the mail fraud charges, that no fraud was committed because each of them provided valuable services to Wedtech even if these services were not accurately disclosed at the time payment was sought. We find little merit in this argument. The mere fact that the defendants may have performed some other services than those specified in their invoices and letters is irrelevant to the issue whether a fraud was perpetrated; the corporation and its shareholders did not receive the services stipulated in the documentation provided by the defendants. By providing misleading information, the defendants concealed essential facts from the corporation and its shareholders, facts which if disclosed might

have led to the relevant payments being recouped and any similar future payments being halted. *See Starr,* 816 F.2d at 98; *Regent Office Supply,* 421 F.2d at 1182.

Relying on *Dowling,* 473 U.S. 207, 105 S.Ct. 3127, the defendants also argue that the charges for violating section 2314 are legally insufficient because no physical property crossed state lines. In *Dowling,* the Supreme Court reviewed a section 2314 conviction which was based on the interstate transportation of bootleg phonograph records which had been manufactured and distributed without the consent of those who owned the copyrights to the musical compositions performed on the records. The Court reasoned that the phonograph records themselves had not been stolen or procured by fraud, only the songs performed on the records were being improperly used. In reversing the convictions, the Court held that the statute does not apply to wholly intangible property interests such as those possessed by a copyright holder. *Id.* at 216–17, 105 S.Ct. at 3133 ("[T]he provision seems clearly to contemplate a physical identity between the items unlawfully obtained and those eventually transported."). The Court concluded that a copyright, like other forms of intellectual property, lacks the physical characteristic that the statute contemplates. *Id.* at 217–18, 105 S.Ct. at 3133.

In reaching this conclusion, the Court placed emphasis on the special nature of federal copyright law. *Id.* at 217, 105 S.Ct. at 3133. Specifically, a copyright holder does not enjoy complete and inviolable control over the use of his or her work. *Id.* The Copyright Act comtemplates, in limited circumstances, that others can make use of copyrighted information without obtaining the holder's permission. *Id.* Because federal law permits such intrusions, the Court reasoned: "the property rights of a copyright holder have a character distinct from the possessory interest of the owner of simple 'goods, wares, [or] merchandise,' for the copyright holder's dominion is subjected to precisely defined limits." *Id.* Given the distinct nature of copyrights, the Court noted that interference with a copyright "does not easily equate with theft, conversion, or fraud." *Id.*

The *Dowling* Court found additional support for its decision when it examined the history of the Act. The Court determined that section 2314 originally was adopted to criminalize conduct which absent its interstate characteristic would ordinarily have been left to the states to regulate. Because Congress had exclusive power over the area of copyrights, whether or not interstate commerce was involved, the Court stated that it would be "implausible to suppose that Congress intended to combat the problem of copyright infringement" when it passed section 2314. *Id.* at 220–21, 105 S.Ct. at 3135. The Court, therefore, held that section 2314 could not provide the basis for a prosecution stemming from the interstate transportation of copyrighted material.

The defendants argue that the reasoning of *Dowling* is directly applicable because the only property alleged to have been transported with knowledge that it was procured by fraud was the shareholders' "right to control" and their related interest in not having the earnings of the company artificially inflated. The defendants contend that these property interests, like the copyrights in *Dowling,* are entirely incorporeal and cannot provide the basis for a section 2314 conviction. We, however, do not find *Dowling* to be controlling.

In contrast to the situation in *Dowling,* the defendants herein were charged simply with transporting checks across state lines knowing them to have been procured through fraud. Each check at issue had a value that exceeded $5,000. The checks, unlike the copyrights in *Dowling,* without a doubt constitute physical property within the meaning of the statute. Moreover, the defendants' acquisition and transportation of that property wholly deprived Wedtech of the use and benefit of those funds; such a complete deprivation does not occur in the context of a copyright infringement. Finally, neither state nor federal law permits the assets of a corporation to be dissipated by corporate officials and those acting in concert with them for undisclosed

purposes. As we made clear in our discussion of the mail fraud charges, the intentional provision of false and inaccurate financial information can constitute a fraud. A direct product of this fraud, under the government's theory, was the checks that were issued in payment for the services noted in the various invoices and letters submitted by the defendants. We are convinced that such allegations state a viable charge under the National Stolen Property Act.

Furthermore, we reiterate that the participation of Wedtech officers in this alleged scheme does not rule out the existence of fraud. Defendants contend that because the officers and directors of Wedtech were aware of everything that had transpired and willingly disbursed the relevant funds there can be no violation of the statute. In short, they assert that one cannot acquire by fraud what one has been voluntarily given. As this Circuit has recognized: "Because the concept of 'stolen' property requires an interference with the property rights of its owner, property that has been transported, ... or otherwise disposed of, with the consent of the owner cannot be considered 'stolen' within the meaning of §§ 2312–2315." *United States v. Bennett*, 665 F.2d 16, 22 (2d Cir.1981).

The linchpin of the defendants' argument is that shareholders possess no right to control the day-to-day operations of a corporation and no possessory interest in corporate property. Notwithstanding the truth of these premises, shareholders do have a right to receive accurate and complete information and they are the beneficial owners of corporate assets. As we discussed in connection with the mail fraud charges, when false information is intentionally provided to the corporation, a fraud on the corporation and its shareholders is committed. Any monies dispersed to satisfy these false invoices, in our opinion, also have been procured by fraud.

In this regard, we find the Sixth Circuit's reasoning in *United States v. Gullett*, 713 F.2d 1203 (6th Cir.1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 973, 79 L.Ed.2d 211 (1984), to be persuasive. In *Gullett*, two partners in an accounting firm engaged in a scheme in which clients of the firm wrote checks to the firm for services that were never performed. In turn, the clients took a tax deduction and ultimately shared in the proceeds of the checks. The defendants, the accounting firm partners, attacked their section 2314 convictions asserting that the officers of the allegedly defrauded corporations had used their "agency powers to write checks for the purpose of generating cash to benefit the corporations." *Id.* at 1210. The Sixth Circuit rejected this argument stating: "This explanation ... ignores the parade of phony invoices and fictitious payees which were created in order to deceive uninvolved corporate officers and shareholders." *Id.* The *Gullett* Court further explained:

> Although corporate officers with broad agency powers authorized and participated in the scheme, the officers necessarily made false entries on the books of their corporations in order to secure the corporate payments. These false entries deliberately misrepresented the nature of the transactions to the corporation as an entity and hence to its owners, the shareholders, and its directors. In reliance on these false statements, the corporation made the payments. The defendants knew the invoices and documents were false and that the corporations would rely on them to make payments. Thus the basic elements of fraud—misrepresentation and detrimental reliance—are present.

*Id.* at 1211.

The defendants contend that *Gullett* is inapposite and should not be relied on because there not all the officers of the corporations involved were a party to the scheme. Here, they argue the government does not contend that any Wedtech officers or directors were not aware of what was happening. We think that this argument completely misses the mark. Officers and directors owe a duty to the corporation and its shareholders. If all the officers and directors become a party to a scheme to use corporate assets improperly, the resulting injury to the entity and its owners—the

shareholders—is no less than when only some of the officers are involved. Officers and directors do not have a license to plunder corporate treasuries acting individually or collectively. The defendants, according to the government, were completely aware that Wedtech's officers were requesting false invoices so as to mislead the corporation and its shareholders regarding the true purposes for the payments. In this respect, the defendants were knowing parties to this concealment, and their submission of the requested documentation made the scheme possible. As we once stated in a mail fraud prosecution, "regardless of the fact that higher officials directed the wrongful acts, the harm was no less injurious to the corporation." *Weiss,* 752 F.2d at 785.

The defendants advance one other argument to attack the validity of the section 2314 charges. They maintain that the Act does not unambiguously apply to the specific conduct charged in the indictment and therefore these charges should not be permitted to stand. They urge application of the "rule of lenity," which requires that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). The rule recognizes that legislatures and not the courts should define criminal liability. *Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed.2d 434 (1985). "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Id.* We conclude that application of the rule of lenity is unwarranted in this case.

 Application of the rule of lenity is warranted only where the statute's language or intended purpose is unclear. Quite recently the Supreme Court, in rejecting a similar challenge to another aspect of section 2314 stated: "This Court has never required that every permissible application of a statute be expressly referred to in its legislative history." *Moskal v. United States,* — U.S. —, —, 111 S.Ct. 461, 467, 112 L.Ed.2d 449 (1990). The Court further noted that in adopting section 2314 "Congress' general purpose [was] to combat interstate fraud," and emphasized that the statute should be broadly construed. *Id.* 111 S.Ct. at 468. In view of the government's theory with respect to the section 2314 charges, we fail to see the merit in defendants' argument. Defendants are alleged to have knowingly participated in a scheme which resulted in monies being disbursed from Wedtech ostensibly for services that, in fact, had not been performed or for the benefit of individuals whose identity was concealed. Any property derived from such conduct and then transported across state lines plainly falls within the purview of section 2314. Accordingly, we conclude that the theory advanced by the government is sufficient to support the section 2314 charges and that the rule of lenity does not apply.

E. Count Five: The Conspiracy Charge

Count Five of the indictment charged Wallach with conspiracy, in violation of 18 U.S.C. § 371. The government charged that the conspiracy had two objects: (1) to defraud the citizens of the United States of their right to Wallach's honest and faithful services, and (2) to violate 18 U.S.C. § 203, which prohibits the receipt of or the agreement to receive any compensation for services to be rendered at a time when the intended recipient is an officer of the United States. Wallach attacks the legal sufficiency of these charges. Because of our decision to reverse all the convictions, we do not address Wallach's evidentiary challenges. We limit our discussion to Wallach's legal argument that only those individuals who actually become federal officials can be charged with conspiring to violate Section 203.

Section 203(a)(2) is aimed at preventing the corruption of public officials. During the relevant time period, the statute provided in pertinent part:

(a) Whoever, otherwise than as provided by law for the proper discharge of

official duties, directly or indirectly receives or agrees to receive, or asks, demands, solicits, or seeks, any compensation for any services rendered or to be rendered either by himself or another—

. . . .

(2) at a time when he is an officer or employee of the United States in the executive, legislative, or judicial branch of the Government, or in any agency of the United States ...

in relation to any proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which the United States is a party or has a direct and substantial interest, before any department, agency ... or any civil, military, or naval commission.

18 U.S.C. § 203(a) (1982).

Wallach never became a federal official or employee. Wallach, therefore, argues that mere anticipation of obtaining a position in the federal government provides a legally insufficient basis to maintain a prosecution under section 203. Essentially, Wallach argues that a person cannot conspire to violate a substantive statute when the substantive statute does not reach that person. Even assuming the correctness of Wallach's initial premise, we find his arguments to be unpersuasive as they relate to a conspiracy charge.

■■■■■■■ "It is well settled that the law of conspiracy serves ends different from, and complementary to, those served by criminal prohibitions of the substantive offense." *United States v. Feola*, 420 U.S. 671, 693, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975). The law of conspiracy serves two independent values: (1) it protects society from the dangers of concerted criminal activity, and (2) it serves a preventive function by stopping criminal conduct in its early stages of growth before it has a full opportunity to bloom. *Id.* at 693–94, 95 S.Ct. at 1268. As the applicable law has been summarized:

The law of conspiracy identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon actually is committed. Criminal intent has crystallized, and the likelihood of actual, fulfilled commission warrants preventive action.

*Id.* at 694, 95 S.Ct. at 1268 (citations omitted). Thus, to establish the existence of a conspiracy the government need only establish the existence of an agreement and an overt act in furtherance of the agreement. *United States v. Giordano*, 693 F.2d 245, 249 (2d Cir.1982). "Whether the substantive crime itself is, or is likely to be, committed is irrelevant." *United States v. Rose*, 590 F.2d 232, 235 (7th Cir.1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979). Conspiracy is a crime separate and apart from the substantive offense that is the object of the conspiracy. Because it is the conspiratorial plan itself that is the focus of the charge, the illegality of the agreement is not dependent on the actual achievement of its goal. *Giordano*, 693 F.2d at 249. Indeed, "it does not matter that the ends of the conspiracy were from the beginning unattainable." *Id.; see also United States v. Petit*, 841 F.2d 1546, 1550–51 (11th Cir.) (conviction for conspiring to receive stolen goods which had been transported by an interstate carrier affirmed even though goods themselves had not been stolen), *cert. denied sub nom. Fernandez v. United States*, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988); *United States v. LaBudda*, 882 F.2d 244 (7th Cir.1989) (conviction for conspiring to sell stolen U.S. Savings Bonds proper even though government had not proven that bonds were in fact stolen). Impossibility, therefore, is not a defense to a conspiracy charge. *See* W. LaFave & A. Scott, *Criminal Law* 545–46 (2d ed. 1986). "[I]t is the intent of the defendants to violate the law which matters, not whether their conduct would actually violate the underlying substantive statute." *LaBudda*, 882 F.2d at 248 (citing cases). The central question becomes whether the government's proof could es-

tablish that the accused planned to commit a substantive offense which, if attainable, would have violated a federal statute, and that at least one overt step was taken to advance the conspiracy's purpose. *Giordano*, 693 F.2d at 249.

 Under the government's theory, Wallach agreed with Guariglia and other Wedtech officers to continue to lobby on behalf of Wedtech once he obtained a position within the federal government. In addition, the government contends that in contemplation of Wallach becoming a federal official a $300,000 advance payment was made to avoid any appearance of impropriety and to conceal Wallach's agreement to continue to lobby on behalf of Wedtech while holding a federal office. The parties to the agreement believed that Wallach would soon be a federal official and they structured their dealings accordingly. Thus, the government's theory encompasses the two essential elements of a viable conspiracy charge—agreement and overt act. At a retrial, a jury will have the ultimate responsibility for determining whether the government's evidence actually proves beyond a reasonable doubt the existence of these two elements. Under Wallach's approach, however, a charge of conspiring to violate section 203 could only be maintained if one of the parties involved actually was a federal official at the time of the agreement. We reject this interpretation.

Section 203 is aimed at limiting corruption within the federal government by safeguarding the integrity of the public administration. As the Supreme Court has explained:

> Conflict of interest legislation is "directed at an evil which endangers the very fabric of a democratic society, for a democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption."

*Crandon v. United States*, 494 U.S. 152, ——— n. 20, 110 S.Ct. 997, 1005 n. 20, 108 L.Ed.2d 132 (1990) (quoting *United States*

*v. Mississippi Valley Generating Co.*, 364 U.S. 520, 562, 81 S.Ct. 294, 315, 5 L.Ed.2d 268 (1961)). To achieve its purpose, the statute precludes federal employees from receiving any compensation from private parties for providing services in connection with any matter in which the United States has an interest. *See United States v. Evans*, 572 F.2d 455, 480 (5th Cir.), *cert. denied sub nom. Tate v. United States*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978). A conspiracy to engage in conduct violative of the substantive statute is equally threatening to the integrity of the governmental apparatus that section 203 seeks to protect. Thus, recognizing the legitimacy of a conspiracy charge even when none of the alleged parties to the agreement is as yet a federal official is entirely consistent with section 203's purpose and intent.

 By its very nature, conspiracy law often is aimed at reaching behavior that is intended to take place at a future time and in many instances attainment of the conspiracy's object turns on certain conditions being met or satisfied. *See* Note, *Conditional Objectives of Conspiracies*, 94 Yale L.J. 895, 899 (1985). In our view, where such a situation is involved, the relevant question is whether the alleged conspirators subjectively believed that the conditions necessary for attaining the objective were likely to be fulfilled. *See generally id.* at 905–06. This approach appropriately focuses on the actual intent of the alleged parties to the conspiracy. The mere happenstance that Wallach's purported goal of obtaining such employment was not realized should not in our view insulate him from such a charge. Accordingly, we see no bar to the charge of conspiracy to violate section 203.

Wallach was also charged with conspiring to defraud the citizens of the United States of his honest and loyal services. We see no need to discuss in detail Wallach's arguments relating to this aspect of Count Five. However, in the event of a retrial, the district court should clarify the instructions relating to this particular charge by making it absolutely clear that the "honest and loyal" services at issue are those of

Wallach himself and not those of Meese. By making this minor adjustment in the language of the instructions, any ambiguity should be removed and the potential for misinterpretation by the jury significantly lessened.

**F. The District Court's Evidentiary Rulings**

■ Wallach asserts that the district court improperly permitted the government to introduce evidence regarding prior incidents of conduct. He submits that under Fed.R.Evid. 404(b) and under Rule 403 this evidence should have been excluded. Although we have adopted an "inclusionary approach" to the introduction of similar act evidence as long as the evidence is not being introduced to show propensity, *United States v. Brennan*, 798 F.2d 581, 589 (2d Cir.1986), a district court must be careful to consider the cumulative impact of such evidence on the jury and to avoid the potential prejudice that might flow from its admission. *See United States v. Peterson*, 808 F.2d 969, 974 (2d Cir.1987) (probative value must exceed potential for prejudice); 2 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 404[08] (1990).

■ The evidence at issue involved a showing that Wallach accepted $150,000 to lobby Meese to obtain the support of the United States for a Mid–East pipeline. The evidence proffered and ultimately introduced showed that Wallach, through a series of transactions, one which involved Chinn, received the $150,000 and did not disclose it on his income tax returns. The government argued that this evidence of "other crimes, wrongs, or acts" was probative of Wallach's intent in his dealings with Wedtech. The district court found this evidence relevant to show that Wallach's concealment of the Wedtech payments was not innocent. We see no error in the introduction of this evidence. The district court, however, also permitted the prosecution to delve into other instances of Wallach's conduct.

During the cross-examination of Wallach's character witnesses, the government was permitted to introduce evidence concerning Wallach's performance as a personal injury attorney in the California case of *Bert v. Wenzel.* Specifically, the government questioned the witnesses' knowledge about Wallach's handling of this personal injury case in which two young children were severely burned. The government's evidence focused on Wallach's agreement to settle the case for $1.7 million and to retain $1 million as his fee. The settlement was approved over the objections of the children's parents by then-California State Judge, Eugene Lynch. At the time of the approval, Wallach had been encouraging Meese to recommend Lynch for an appointment to the federal bench. The district court concluded the government had shown a "good faith basis" for inquiry into the matter.

■ Under Fed.R.Evid. 405, the government is permitted to ask questions of character witnesses concerning their knowledge of specific instances of the defendant's conduct. 22 C. Wright & K. Graham, *Federal Practice & Procedure*, § 5268, at 609–11 (1978). This is because the defense essentially has placed character in issue. However, the reason the rules of evidence limit the extent to which such collateral character evidence is admissible is to ensure that the jury does not convict the defendant for conduct with which he has not been charged. 22 *Federal Practice & Procedure*, § 5239, at 437–38.

■ Although the *Bert v. Wenzel* evidence may have been technically admissible, we believe that a district court must proceed with caution and carefully evaluate the cumulative effect of such evidence on a jury. The district court always has the authority and discretion to exclude such evidence under the balancing test mandated by Fed.R.Evid. 403. Here, with particular reference to the *Bert v. Wenzel* evidence, our concern has been elevated by the manner in which the prosecution argued this evidence to the jury. The prosecutor made a blatant effort to prejudice the jury in his appeal for vengeance by inviting the jurors to stand in the shoes of the parents of the children involved in the case. He also characterized Wallach's behavior

as an "outrage." This was overzealous advocacy. These comments were unnecessary and in our view quite prejudicial. Wallach was not on trial for his conduct concerning the personal injury case. While some limited inquiry into this matter may have been probative of the scope of knowledge on which Wallach's character witnesses were operating, we believe that inquiry into the entire matter was expanded well beyond the bounds of propriety and relevance. Thus, in the event of a retrial, steps should be taken to confine the use of such evidence to its intended purpose— challenging the basis for the character witnesses' opinions.

## G. The Remaining Issues

We have considered the other arguments advanced by the defendants but choose to address at this time only those that are likely to recur at a retrial.

## CONCLUSION

Because we believe that the perjury of one of the government's key witnesses infected the trial proceedings and interfered with the jury's ability to weigh his testimony, we reverse all the convictions. Additionally, our review of defendants' other arguments leads us to conclude that the charges advanced in the indictment are legally sufficient. Accordingly, we reverse all the judgments of conviction and remand for a new trial.

ALTIMARI, Circuit Judge, concurring:

I cannot subscribe to the notion that the Assistant United States Attorneys ("AUSAs") who represented the government in this case should have known that Anthony Guariglia was committing perjury at the time of trial. I do agree, however, that reversal is warranted despite the fact that the government had no knowledge of Guariglia's perjury. Accordingly, I write separately to express my views on these issues.

The idea that the government would knowingly rely on false testimony in obtaining a conviction is repugnant to the very concept of ordered liberty and is perhaps the most grievous accusation that can be levelled against a prosecutor. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *see also Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). A review of the entire record including the post-argument submissions [1] leaves me with the firm conviction that the AUSAs properly discharged the obligations of their office. Therefore, in contrast to the majority, I do not believe that "a virtual automatic reversal" of the defendants' convictions is mandated. *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976).

To appreciate fully what the prosecutors knew about the admission of Anthony Guariglia's perjurious testimony, it is important to understand when and how this matter initially arose. During vigorous cross-examination, defense counsel confronted Guariglia with documents, obtained from the Tropicana Casino in Atlantic City, indicating that Guariglia had signed three markers totalling $15,000 in September 1988 and one $50,000 marker in October 1988. These markers provided strong circumstantial evidence that, despite his testimony to the contrary and despite the requirements of his cooperation agreement, Guariglia had gambled after the summer of 1988. On re-direct examination, Guariglia reiterated that he had not gambled. Instead, he claimed that he had exchanged the markers totalling $15,000 for cash and had used the $50,000 marker to obtain chips for Marshal Koplitz, a friend and business associate.

Certainly, if the government had simply accepted at face value Guariglia's some-

---

1. I note with displeasure that much of the information regarding Guariglia's perjury and the government's response to that perjury was presented in a series of post-argument letters to the Court. As this Court has previously stressed, such submissions are looked upon with extreme disfavor. *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir.1987) (per curiam). However, it was the defendants who initiated the submissions, to which the government merely responded.

what dubious explanation, a legitimate question might be raised about the prosecutors' conduct. However, this is not what occurred. Rather, in the midst of trial, the AUSAs extensively questioned Guariglia about the events in Atlantic City and the truthfulness of his testimony. Moreover, in an attempt to ascertain the truth or falsity of Guariglia's story, the AUSAs located and interviewed Koplitz and another individual who was with Guariglia in Atlantic City. Both verified Guariglia's version of events. Additionally, the prosecutors—albeit with limited success—attempted to contact and interview Tropicana Casino officials. Thus, it seems to me that the AUSAs did all that was reasonable to assure that they were neither relying on false testimony nor permitting false testimony to go uncorrected. *Cf. Stofsky,* 527 F.2d at 244 ("We do not employ the omniscience of a Monday morning quarterback as the standard for determining what investigation should have been made by the government.").

It should also be realized that when the government did obtain meaningful evidence that Guariglia had perjured himself at trial, the AUSAs did not hesitate in undertaking an investigation and prosecution that ultimately resulted in Guariglia's perjury conviction. To my mind, this is a further illustration that throughout the proceedings the AUSAs sought to learn—not avoid or ignore—the truth.

Thus, I believe that the critical issue on this appeal is whether Guariglia's perjury is so material that "the jury probably would have altered its verdict if it had had the opportunity to appraise the impact [of the perjury] not only upon the factual elements of the government's case but also upon the credibility of the government's witness." *Stofsky,* 527 F.2d at 246. In considering this issue, the district court concluded that "this additional brace of wrongdoings, if known to the jury, would not in any way have had the slightest effect upon its verdict." *United States v. Wallach,* 733 F.Supp. 769, 771 (S.D.N.Y. 1990). This conclusion was based on Judge Owen's consideration of a broad array of factors:

The testimony was not material: Guariglia's gambling and skimming did not bear on the defendants' guilt or innocence, only on Guariglia's credibility. And here, these instances of falsehood would have been merely minor, cumulative additions to the massive mound of discredit heaped upon Guariglia over several days of both direct and cross-examination. The jury heard that Guariglia's past included: bribery of numerous government officials, including Congressmen Biaggi and Garcia, Richard D. Ramirez of the Navy, Gordon Osgood of the Army, Jerrydoe Smith of the Postal Service, Peter Neglia of the Small Business Administration and Vito Castellano of the National Guard; commercial bribes to bank officials and a Con Edison employee; countless false filings with the Securities and Exchange Commission, the Small Business Administration and the Internal Revenue Service; the use of kickbacks, frauds and the use of the 'FHJ slush fund' to steal $1,624,702 from Wedtech; the payment of over $500,000 in illegal payoffs to union officials for labor peace; the fabrication of a Navy telex to inflate Wedtech's apparent profit; concealing ill-gotten gains in nine foreign bank accounts; false statements to District Attorney Morgenthau and his staff when the investigation began, and, during the course of the investigation, obtaining a false Swedish passport. The defendants also brought out post-cooperation wrongdoing in connection with tax irregularities, arguable continued gambling in Atlantic City, and continued failure to make restitution to the Wedtech shareholders....

*Id.* at 771–72.

While the foregoing recitation is undeniably powerful, it is also somewhat misleading, because it fails to take proper account of the unique and oftentimes devastating impact of a witness perjuring himself in front of a jury. While disclosure of such perjury might not transform the jury's image of the witness from paragon to knave, *see United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981), *cert. denied,* 456 U.S. 946,

102 S.Ct. 2014, 72 L.Ed.2d 469 (1982), it may provide the proverbial straw that broke the camel's back. *See, e.g., United States v. Seijo,* 514 F.2d 1357, 1364 (2d Cir.1975). Indeed, as the majority cogently explains, Guariglia was an essential witness at trial and, while there may have been heated argument over his credibility and misdeeds, his ongoing perjury had not been revealed to the jury.

In sum, I agree with the majority's conclusion that reversal of the convictions is warranted. But I do so solely on the ground that "the jury probably would have altered its verdict" had it been aware of Guariglia's on-going perjury. *Stofsky,* 527 F.2d at 246. In all other respects, I concur in the majority's well-reasoned opinion.