**UNITED STATES of America,**

v.

**Reynaldo ARROYO.**

**No. CRIM. 3:03CR179(SRU).**

United States District Court,
D. Connecticut.

Jan. 27, 2004.

Paul F. Thomas, Federal Public Defender's Office, New Haven, CT, for Reynaldo Arroyo.

Kevin J. O'Connor, U.S. Attorney's Office—NH, New Haven, CT, Ronald Scott Apter and Thomas V. Daily, U.S. Attorney's Office—HFD, Hartford, CT, for United States of America.

## RULING ON DEFENDANT'S MOTION FOR A NEW TRIAL

UNDERHILL, District Judge.

On November 5, 2003, a jury convicted Reynaldo Arroyo of unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Following the verdict, Arroyo timely filed a motion for new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Arroyo argues that the verdict represents a manifest injustice and, in the alternative, that he should be granted a new trial in light of newly discovered evidence.

The prosecution's case against Arroyo depended almost entirely on the testimony of the arresting officer, Michael Manzi, who testified that he saw Arroyo holding a gun and chased him over a short distance, without losing sight of him for more than a second or two, before arresting him. Manzi swore that his chase and arrest of Arroyo took a total of "17 seconds, at the very most." This timing starkly contrasted with the version of events given by a defense witness present at the scene of the arrest. Because there was no forensic evidence connecting Arroyo to the gun, the case became a credibility contest.

The prosecutor bolstered Manzi's credibility on the critical issue of timing by playing several times, during both trial and closing arguments, a short audiotape of police transmissions that Manzi testified represented a real-time recording of events. Repeatedly during closing argument, the prosecutor pointed out how Manzi's version of events corresponded to the elapsed time reflected by the tape, while the defense witness' version was inconsistent with the length of the tape. The timing of events set forth on the tape provided strong, objective evidence that Manzi was telling the truth. Soon after trial, however, the parties discovered that the tape was not, in fact, a real-time recording. The actual timing of the police broadcasts reveals that Manzi's testimony was materially inaccurate. Indeed, the events that Manzi swore took seventeen seconds "at the very most" actually lasted much closer to two minutes and nine seconds. Thus, because the distance over which the chase occurred was quite short, the chase could not have lasted two minutes and also have been the hot pursuit that Manzi described.

Following a careful review of the trial record, I am left with a distinct concern that an innocent person may have been convicted. Accordingly, I exercise my discretion to grant Arroyo a new trial.

## BACKGROUND

The parties stipulated both that Arroyo had a prior felony conviction and that the firearm at issue had been manufactured in Brazil and imported into Miami, Florida. Tr. Nov. 3, 2003 at 228. Accordingly, the only salient issue at trial was whether Arroyo possessed the firearm. The trial lasted less than two days.

### The Evidence at Trial

The prosecution called five witnesses at trial: the arresting officer, his partner, and three forensic witnesses.

The prosecution's principal witness was Michael Manzi. Manzi is presently Chief of the Suffield, Connecticut Police Department. Tr. Nov. 3, 2003 at 30. On December 31, 2002, he was a 22–year veteran of the Hartford Police Department, then serving as the Lieutenant Commander of the Community Response Division in the South District of the City. *Id.* at 31. That night, Manzi was on a uniformed patrol in a police cruiser with Sergeant Scott Sansom, *id.* at 40, when, at about 9:08 p.m., they heard a police radio broadcast about a knife fight in front of the Silver Dollar Café on Zion Street in Hartford. *Id.* at 41. At the time, Manzi and Sansom were traveling westbound on Park Street, which was very close to the scene of the fight. *Id.* Sansom radioed that his car, unit five-seven, was responding to the scene. *Id.*

While still on Park Street, and immediately after Sansom's report to the dispatcher, Manzi and Sansom heard a gunshot fired from a distance away. *Id.* at 42. Upon turning from Park Street to Zion Street, "we saw a commotion up into the front of where the Silver Dollar was, right in the middle of the street. There was a large crowd out there, might be five or six individuals who were facing toward us, one individual with his back toward us in the middle of the street." *Id.*

As the cruiser pulled up, Manzi turned his attention to his left or the east side of the street to an individual wearing a white jacket. *Id.* Manzi told Sansom three times to "watch the guy with the white." *Id.* He said this immediately after rounding the corner from Park Street onto Zion Street. *Id.* at 107. The officers pulled up and stopped their cruiser fifteen feet behind the person in the white jacket, who then turned around and looked at the car. *Id.*

at 42. The individual in white was "holding what appeared to be a firearm in his right hand. On observing us and we were in a marked police unit, I had already started to bail out of the cruiser and Sergeant Sansom was calling a description of this individual to the dispatcher." *Id.* at 43. Manzi "pursued this individual into the Silver Dollar Café and up a flight of stair where he had gone into, what ultimately I found out to be a lady's bathroom, and I pulled him out, patted him down and brought him back down the three or four flights of stairs.[1] Told Sergeant Sansom to handcuff this guy. I went back to the bathroom and I located a firearm in the waste paper basket in that bathroom." *Id.*

An audiotape of police radio transmissions was admitted as exhibit 3 and played for the jury. A transcript of that recording, exhibit 4 for identification, was distributed to the jury to assist them as they listened to the tape, but was not admitted into evidence. Manzi had listened to the tape to prepare for his testimony in court. *Id.* at 45. The tape was then replayed and Manzi commented on the recording. The first part of the tape records a call to the 911 dispatcher, reporting a knife fight at the Silver Dollar; that portion of the tape was not transmitted to officers in the field. *Id.* at 46. Sansom asked the dispatcher if there was a description of the "guy who's got the knife," but the dispatcher did not have one. *Id.* at 49.

Just after Sansom reported that they were approaching the scene, but before they turned onto Zion Street, the officers heard a gunshot. *Id.* at 50. No mention of the gunshot was included in any police broadcast that evening. About ten sec-

---

1. Based upon the photographs of the Silver Dollar Café introduced into evidence, I believe that Manzi meant to say three or four stairs, rather than three or four flights of stairs. *See* Tr. Nov. 3, 2003 at 61 ("I then kind of dragged him down two or three stairs....").

onds elapsed between receiving the first call about the Silver Dollar and the cruiser stopping at the scene. *Id.* at 133–34. Upon arrival at the Silver Dollar, the officers were not "concerned that there was a knife fight going on in the middle of the street." *Id.* at 100.

Sansom radioed that "I've got a guy in a white shirt, he's running, he went back in." *Id.* at 56. Manzi testified that, "Just as he's saying that, . . . . I'm already out of the car, we call it a bail-out, and I'm bailing out of the cruiser and I'm in pursuit of this individual with the white jacket who ran . . . to the front door of the Silver Dollar." *Id.* at 57. Manzi "pursued right after him and . . . was 15 to 20 feet behind him." *Id.* Manzi bailed out from the front passenger seat of the cruiser, "opened the door, and I'm running out just as the car's coming to a stop and I'm in pursuit of this guy . . . . [T]he gentleman turned around, I saw what appeared to be a handgun in his right hand." *Id.* at 59. Manzi got a look at the individual's face and "didn't know him personally . . . but recognized his face." *Id.* Manzi later made an in-court identification of Arroyo as the individual he pursued and arrested that night. *Id.* at 73.

Manzi described his pursuit of the individual into the Silver Dollar Café. The individual "ran through the front door. I'm behind him, I'm running through the front door, and as I run through the front door I see some stairs in the back there with—I see the individual turning to the right and going into a door on the right hand side at the top of the stairs there." *Id.* at 61. Manzi pursued him to that location and, as he cautiously opened the door, the individual with the white jacket was coming out. Manzi performed a cursory pat down, "kind of dragged him down two or three stairs," and gave him to Sansom for handcuffing. Manzi then went back up the stairs and found a loaded firearm in the waste paper basket in the bathroom. *Id.* Arroyo did not appear to be wearing gloves, and none were recovered in the bathroom. *Id.* at 117.

Manzi testified that, throughout the pursuit, he never lost sight of the individual in white "except for the door itself, until I got [to] the door. It was maybe a second, maybe two seconds at the very max that I momentarily lost sight of him but was still in pursuit of him running." *Id.* at 61–62. Manzi kept his eyes on the man as he ran into the Silver Dollar and saw him "running toward the rear of the establishment and as I entered, he was going into a, ultimately what turned out to be a women's bathroom." *Id.* at 135. It was a short distance from the front door to the bathroom, and Manzi arrived at the bathroom door only seconds after the individual closed it. *Id.* at 116.

Manzi found a gun in the waste paper basket in the bathroom, with a piece of paper over it. *Id.* at 64. Concerned for Sansom's safety, Manzi "picked up the weapon and . . . breached it to make sure it was secure and then went back downstairs. And as I'm walking down the stairs I see two more officers come in so I know we're pretty safe and secure now." *Id.* at 65. Manzi believed that the weapon he found had been recently fired, because it "was a little bit warm to the touch." *Id.* at 76.

When asked how much time transpired from the time Manzi and Sansom stopped their police vehicle until the time that Manzi located the firearm, Manzi responded, "Say about 17 seconds." *Id.* at 69. On cross-examination, Manzi reiterated that "from the time I bailed out of the car until the time I went and actually physically confronted the defendant and brought him down to the sergeant" took "about 17 seconds, at the very most." *Id.* at 85.

Manzi testified that, since he left the Hartford Police Department, he had not spoken to any other officers on the scene of the arrest about that arrest. *Id.* at 87.

On cross-examination, defense counsel questioned whether the tape of the police transmissions was a real-time recording: "Now, one of the things that the tape does is it plays straight through but there was more time involved this night between the events at the beginning and at the end than comes across on the tape, correct? That's not a beginning-to-end complete transcription of all the dead air time, for example?" Manzi testified: "It would be from the point where the dispatcher says Unit Two and Unit Three, that would be an actual time transpiring as opposed to when the first 911 call came in. I can't attest to how long it took to dispatch that car." *Id.* at 115–16. "Q. If the tape takes two minutes from beginning to end you're saying, excluding the 911 part, that was two minutes of actual real time?" "A. Yes." *Id.* at 116.

The prosecution's next witness was Scott Sansom. Sansom is employed by the Hartford Police Department and is currently assigned to the Internal Affairs Division. *Id.* at 144. Sansom was working a uniformed patrol with Manzi on December 31, 2002. *Id.* at 147. He heard a radio dispatch about a knife fight at the Silver Dollar while traveling on Park Street, then heard a gunshot, before turning onto Zion Street. *Id.* at 148–49. Sansom testified that only three to five seconds passed from the time of the initial dispatch regarding the knife fight until the cruiser stopped near the restaurant, *id.* at 150–51, even though they were not traveling at a high rate of speed. *Id.* at 174. It took about three seconds to get from the end of Zion Street to the Silver Dollar, traveling "Fifteen, 20 miles per hour. Slow." *Id.* at 184.

Although Manzi testified that there was a Jeep Cherokee parked directly in front of the door to the Silver Dollar on the night of Arroyo's arrest, *id.* at 103–04, Sansom does not believe that the Jeep Cherokee was in front of the Silver Dollar that night. *Id.* at 176. Also contrary to Manzi's testimony, Sansom testified that the crowd in front of the Silver Dollar numbered about 20 persons. *Id.* at 152.

As Sansom stopped the car he radioed a description of an individual with "a white jacket or shirt on" who ran into the bar. *Id.* at 156. Sansom did not radio that the man in white had a gun or any type of weapon. *Id.* at 174. He did not give a complete transmission because he was rushing. *Id.* at 190. Sansom did not recognize the individual. *Id.* at 157–58. Manzi followed the individual into the bar, and Sansom "went in behind Manzi." *Id.* at 156. As Sansom went into the bar, "Manzi had a hold of the defendant, gave him a quick pat-down and said, 'Secure him.' [Sansom] secured him. Lieutenant Manzi went into the bathroom and found the—a pistol." *Id.* at 156–57.

Sansom testified that the entire incident "happened within a few seconds." *Id.* at 177. Sansom parked, got out of the car, went inside and was told to handcuff the defendant "all within a matter of seconds." *Id.*

Sansom testified that, on the morning of their testimony in court, he talked with Manzi about the arrest of Arroyo on December 31st. *Id.* at 168. They spoke about the incident; "A few minor, brief things. I don't recall exactly what it was." *Id.* at 188.

Next the prosecution called three forensic witnesses. The first was Kevin Parisi, an employee of the Connecticut State Forensic Laboratory, who testified about his fingerprint examination of the weapon. *Id.* at 192. Parisi has been doing fingerprint work for over eight years. *Id.* at 193. Parisi tested the Taurus handgun,

magazine, and spent shell casing. *Id.* at 195. Parisi did not find any fingerprint impressions whatsoever on any of these items. *Id.* at 196. Parisi explained various reasons why fingerprints might not appear on a handgun. *Id.* at 196–97. Parisi testified that "identifiable prints" are recovered from firearms only "three to 5 percent of the time." *Id.* at 198. Parisi did not testify about the percentage of cases in which no impressions of any kind, even of latent prints, are found on firearms. Parisi testified that he would not expect to find a fingerprint on the firearm handled by the prosecutor in court. *Id.*

Debra Messina, a supervising criminalist at the Connecticut State Forensic Lab, testified about the effort to find gunshot residue on Arroyo. Messina has been working at the State Lab for 23 years. *Id.* at 199. Her tests failed to reveal any lead, barium or antimony on Arroyo's hands. *Id.* at 204. That fact does not establish that Arroyo did not fire the gun or handle the gun. *Id.* Messina testified about various reasons why gunshot residue might not appear on the hands of someone who shot a gun. *Id.* at 205–06. Messina did not test Arroyo's clothing for gunshot residue. *Id.* at 211.

Finally, Edward Jachimowicz, a firearms tool mark examiner employed by the Connecticut Department of Public Service Forensic Science Laboratory, testified that the firearm at issue fired the spent shell casing found outside the Silver Dollar Café. *Id.* at 227.

The first defense witness was Hartford Police Officer Edward Foster. Foster had not listened to the tape of the police radio transmissions prior to trial. Tr. Nov. 4, 2003 at 18. Foster responded to the dispatch concerning the Silver Dollar and, upon arrival, went right into the restaurant. *Id.* at 23. When Foster entered the Silver Dollar, he saw Manzi holding a firearm. *Id.* at 23, 30. Arroyo was being handcuffed. *Id.* at 30. Ivan Maldonado was seated at the bar. *Id.* Arroyo and Maldonado refer to each other as brothers or step-brothers. *Id.* at 47. Foster and his partner found the spent shell casing in front of the Silver Dollar. *Id.* at 26.

According to Foster's police report of the incident, Manzi told Foster that on Manzi's entry into the Silver Dollar Manzi "had seen Mr. Arroyo exiting the ladies room and walking quickly towards the bar." *Id.* at 31. Foster found a knife in the street, *id.* at 36, having been directed to it by Maldonado. *Id.* at 36–37.

On the tape, unit 722 referred to Foster and his partner. *Id.* at 39. The phrase "they got an 83" on the tape means they found a firearm. *Id.* at 40. Foster cannot "recall 100 percent," but he does not believe that any other patrons of the bar were wearing white. *Id.* at 46.

The defense also called Gaspar Gonzalez. Gonzalez was inside the Silver Dollar Café when Arroyo was arrested. *Id.* at 67. Gonzalez testified that he and Arroyo were sitting at bar stools. "We were sitting all the way down towards this end, entrance of the bar. There's a T.V. there. And we were having a beer and police officers came in. They were inside about a couple minutes, three, four minutes, and then they just walked up to him and grabbed him." *Id.* at 67–68. Gonzalez remembers how it happened because, when the officers seized Arroyo, Arroyo's beer spilled on Gonzalez and the officer came back and apologized. *Id.* at 68. On direct examination, Gonzalez said that he had not spoken with Arroyo since the night he was taken into custody. *Id.*

The AUSA conducted a lengthy and effective cross-examination of Gonzalez. Gonzalez has known Arroyo for seven years, and they frequently have a beer together at the Silver Dollar. *Id.* at 69. Arroyo lives at the Silver Dollar, which has

rooms for rent. *Id.* at 70. Gonzalez recalls that there was a fight the evening Arroyo was arrested, *id.* at 76, but did not know that the fight involved a knife. *Id.* at 77. He never saw a knife. *Id.* at 78. During the fight, Arroyo stepped out through the door and yelled at Maldonado. *Id.* at 79. Maldonado had an altercation with a girl about 30 or 40 minutes before the police arrived. *Id.* at 80. Gonzalez did not hear a gunshot. *Id.* Gonzalez admitted speaking to Arroyo since he made bond, but did not speak about the incident. *Id.* at 82. Gonzalez did not see Arroyo with a gun that night and has never seen him with a gun. *Id.* at 86.

*The Closing Arguments*

During its closing and rebuttal arguments, the government repeatedly asked the jury to focus on the issue of time. After thanking the jury for its attention to the case, the prosecutor dramatically removed his wristwatch and, displaying it to the jury, began his closing argument as follows:

> In considering the evidence in the case, both real evidence and testimony in the sense of determining what degree of credence or credibility to assign to that, *I would suggest the time in this case is very important; time as it relates to the time that it took for the events that you've heard about over the course of the past day-and-a-half to occur, and time as relates to the passage of time of the events,* to the time that people have testified, both here and previously; time as it relates to the degradation, as it were, of memory or of various elements as it pertains to the investigative techniques that you've heard about. *Time. Again, I would ask you to consider time.*
>
> In that regard, *I'd like to play the tape* that you've heard previously, and there was at least a portion in that regard to the incident that occurred.

With that in mind, again, *thinking of the time that elapsed during the course of this incident.*

(Tape played.)

> Again, you heard this tape and you heard testimony from Officer Manzi and I believe also from Scott Sansom in regard to what the things meant in that tape, who individuals are and what the references were to. *But, again, think of that from the perspective of time. That is the entire incident at the greatest,* actually because we know that the gun— and again, based upon your recollection of the testimony—was found sometime prior to the last sentence there on that tape, 722, that being Officer Foster who comes into the bar and says that he sees somebody with a gun. *Again, think of the case from the perspective of time and whether or not the testimony by the officers that you heard, Chief—now Chief Manzi, and Sergeant Sansom, is consistent with that time, that real time that you hear on that tape in regard to dispatch.*

Tr. Nov. 4, 2003 at 135–36 (emphasis supplied).

The prosecutor then asked the jury to consider the defendant's case "from a perspective of time." *Id.* at 136. He recounted that Gonzalez testified "that the officers were in the bar for three, four minutes prior to, for apparently no reason, plucking Reynaldo Arroyo off a bar stool and placing him under arrest. *Is that consistent with the time, if nothing else, that is set forth in the recordings that shows, again, the real time, how things were happening?"* *Id.* at 137 (emphasis supplied). Later, the prosecutor drew attention to the fact that Gonzalez's testimony was inconsistent with the timing demonstrated by the tape of the police radio transmissions. "Did [Gonzalez] say seconds did he say a minute or did he say three or four min-

utes? *Is there a difference between three or four minutes and 20 seconds? Is it easy to make a mistake between 20 seconds and three or four minutes?* Ask yourself that question." *Id.* at 150 (emphasis supplied).

The prosecutor also used the tape to bolster Manzi's and Sansom's version of events. "Again, what did Chief Manzi say in regard to what happened that night *in the context of the tape, the transmissions?* What is it that happened over the course of these seconds from the time that the call originally went out over the dispatch, the call which he heard, to the time that the car stops and they—and Chief Manzi bails out of the squad car and pursues the defendant into the Silver Dollar?" *Id.* at 140–41 (emphasis supplied). "Again, ask yourselves what it is that Sergeant Sansom said and *whether or not what he said, again, is consistent with the tape,* what we hear in regard to what was going on and how quickly that was all going on." *Id.* at 142–43. "Again, *we know a very short period of time was involved* during the course of the incident and the circumstances of the incident; that is, the gunshot, seeing an individual with a gun, seeing one's partner following that individual into a bar. *Consider that when you are considering to what extent there may be variations in the testimony.*" *Id.* at 145 (emphasis supplied).

Defense counsel felt compelled to respond in his closing to issues of timing raised by the government. "One of the points that government counsel made at the outset of its argument was that time is important, that the tape is the universe, the beginning of the tape to the end of the tape is the real time that all of these events happened. The only evidence to support that that is the entire universe of time was the testimony of Lieutenant Manzi that this is a real time tape. Nobody else testified that gaps, that air time isn't edited out. Lieutenant Manzi is the one who says it's a complete tape from beginning to end. The tape that we listened to, you'll have available, was a couple minutes long and I submit that there are problems with time that are ones that support the reasonable doubt that the record shows." *Id.* at 154–55.

Defense counsel argued that the testimony was inconsistent with a real-time recording of events. "Yet Ivan Maldonado, who they admit was out in the street fighting, is seated at the bar. Now, either Ivan Maldonado beat them inside from when they arrived and rushed it, or there's something wrong with the time frame and the scenario that they present about how quickly they responded to the scene and went inside." *Id.* at 163. "So how did he beat them inside to be there when the arrest happened unless it took more time than the officers would like you to believe?" *Id.* at 164.

The issue of the timing set forth by the tape came up again in the government's rebuttal argument. "Now on this time issue, I think Mr. Thomas indicated that the testimony that you have *in regard to that tape as being real time* was Lieutenant Manzi. *It wasn't controverted. There is no evidence to the contrary,* and in speaking to the tape, what did Chief Manzi say? I think he indicated ... that he was careful to say that the 911 call was not necessarily real time to the rest of the call, *the part that I played, that was real time, and how much time was it? And that is important.*" *Id.* at 168–69 (emphasis supplied).

*Later Events*

Immediately after the jury retired to deliberate, I expressed to counsel my concern to counsel that "the tape does not reflect real time." Tr. Nov. 4, 2003 at 180; *see id.* 180–81. The following morning, the jury wrote a note suggesting that they

were focusing on the timing of events. That note read: "Does the court have record of the time when the initial 911 call came in about the disturbance at the bar?" Tr. Nov. 5, 2003 at 2. This question appears to be directed at obtaining objective evidence against which to evaluate Gonzalez's testimony that the disturbance had occurred some 30 or 40 minutes before the police arrived, a point the prosecutor emphasized in closing argument.

At about noon on November 5, 2003, the jury returned a guilty verdict. *Id.* at 5. In response, defense counsel indicated an intention to file the present motion for new trial.

On November 7, 2003, a government investigative agent and the defendant's investigator reviewed original records at the Hartford Police Department, not previously possessed or reviewed by either party, from which a precise and accurate timetable of the radio transmissions on the audiotape was prepared. A copy of that timetable is attached to this decision as Exhibit A. As that timetable demonstrates, the tape played at trial and during closing arguments was not a real-time recording, but instead reflected only the time it took the various transmissions to be made, while eliminating dead air time. Thus, the tape played at trial was considerably shorter than the time it actually took events to unfold.

The timetable, which both parties appear to accept as accurate, reveals the following. The initial call from the dispatcher about the knife fight at the Silver Dollar occurred at 9:10 p.m. (21:10:03) Seventeen seconds later, Sansom radioed from Park Street that he and Manzi were approaching the area; Sansom asked for a description of the person with the knife. (21:10:20) The dispatcher reports that he has no description. Eleven seconds after Samson's initial transmission, he has arrived at the Silver Dollar and reports that

"I've got a guy in a white shirt." (21:10:31) This is the point at which Manzi testified he bailed out of the police cruiser. Foster arrived at the Silver Dollar one minute and seventeen seconds after Manzi and Sansom. (21:11:48) In his initial transmission after entering the Silver Dollar, fifty-two seconds later, Foster reported that "they got an 83 [i.e., a firearm]." (21:12:40) Fourteen seconds later, Foster reported that "They got the party cuffed." (21:12:54) In Sansom's first transmission after entering the Silver Dollar (21:13:16), he reported that "We're inside the bar . . . . We got a 10–83 [firearm]."

Based on the timetable, it is apparent that it took eleven seconds for Manzi and Sansom to round the corner from Park Street onto Zion Street and proceed to the Silver Dollar. The playing time of the tape from the point at which Manzi bailed out until Foster reports a firearm is thirty-six seconds; the actual elapsed time, however, is two minutes nine seconds. Neither Manzi nor Sansom made any radio transmissions for two minutes and forty-five seconds after arriving at the Silver Dollar.

## DISCUSSION

■ A district court has discretion to grant a new trial when the "interests of justice so require." Fed.R.Crim.P. 33. Rule 33 allows district courts to order a new trial "to avert a perceived miscarriage of justice." *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992). District courts, however, should use their discretion to grant a new trial "sparingly," reserving new trials for instances in which "it would be manifest injustice to let the guilty verdict stand." *Id.* at 1414 (internal citations omitted). "Manifest injustice" means that "there must be a real concern that an innocent person may have been convicted." *Id.* at 1414.

■ A court should exercise "great caution" in deciding whether to grant a new trial on the grounds of newly discovered evidence. *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir.1993). Such motions are "not favored." *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975). "Ordinarily, relief is justified under Rule 33 only if the newly discovered evidence could not have been discovered, exercising due diligence, before or during trial," and that evidence "is so material and non-cumulative that its admission 'would probably lead to an acquittal.'" *United States v. Gallego*, 191 F.3d 156, 161 (2d Cir.1999) (quoting *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir.1992)); *United States v. Wallach*, 935 F.2d 445, 458 (2d Cir.1991) (concluding that jury probably would have acquitted defendants in a case involving perjured testimony).

In short, a motion for new trial based largely on newly discovered evidence may be granted only in the "most extraordinary circumstances." *United States v. Spencer*, 4 F.3d at 118. This case presents such circumstances. Here the government has not suggested that the evidence of actual elapsed time of events, which was neither known to nor in the possession of the prosecutor, could have been discovered with reasonable diligence. Moreover, that evidence is so material and non-cumulative that its admission would probably lead to an acquittal.

*The Evidence of Guilt*

■ The evidence of Arroyo's guilt was hardly overwhelming. No forensic evidence whatsoever linked him to the crime. No fingerprints of any kind were found on the firearm. No gunshot residue connected him to a gun that had been recently fired. Forensics linked the spent shell casing to the gun, but not to Arroyo. In short, all of the forensic evidence was wholly consistent with Arroyo's innocence.

Arroyo was wearing a white sports jacket at the time of his arrest. Sansom's initial radio transmission noted "I've got a guy in a white shirt." Both Manzi and Sansom testified that the person in white had a gun and that he was the same person later arrested inside the restaurant, i.e., Arroyo. "Such evidence might well have justified a finding of guilt beyond a reasonable doubt even if the gun had never been found. Certainly it tips the balance of probabilities in favor of the government. But it is undermined not only by the physical evidence, but also by the inconsistencies in [the officers'] accounts of the incident." *United States v. Morales*, 902 F.2d 604, 608 (7th Cir.1990).

Due to Manzi and Sansom's testimony connecting Arroyo to the gun, the credibility of these witnesses was of critical importance to the government's case—if the jury disbelieved these officers, then there was literally no evidence of Arroyo's guilt. The defense was able to call the officers' testimony into question through inconsistencies in their testimony, prior inconsistent statements made by Manzi, and the improbability of some aspects of their testimony.

The doubts about the officers' version of events begins with what they did not report by radio transmission that night. Both Manzi and Sansom testified that they heard a gunshot while traveling on Park Street, just before turning onto Zion Street and just after radioing that they were approaching the scene. In the nearly eleven seconds between hearing the shot and their arrival at the restaurant, they did not report the gunshot—thereby failing to warn fellow officers responding to the scene that a firearm might be present. At this point, at least according to Sansom, they were proceeding slowly, so the failure to report their observation cannot be due to their haste.

As they approached the scene, Sansom asked the dispatcher for a description— presumably a description of the person who "just ran into the store, grabbed a knife and went out front and he is fighting with somebody else." The dispatcher reported that no description was available. Nine seconds later, Sansom reports: "Alright. I've got a guy in a white shirt." The officers are reporting to a scene of a person fighting with a knife, ask for a description of the person with the knife and then report a description. A reasonable inference is that they are reporting a description of the person with the knife. Certainly no transmission was made indicating that the guy in a white shirt was, as Manzi and Sansom would testify at trial, holding a gun, rather than a knife. Again, the failure to warn responding officers that the suspect whose description has been given over the police radio has a gun rather than a knife, as previously reported, calls into doubt the testimony that the guy in a white shirt was holding a gun.

There are numerous, if minor, inconsistencies between Manzi's and Sansom's testimony of events leading up to the chase. How far away they were when they noticed the guy in a white shirt, how large was the crowd gathered in the street, whether the Jeep Cherokee was parked in front of the Silver Dollar, and how close they parked to the guy in a white shirt are all issues on which they gave different testimony. They also testified differently on the question whether they had discussed the arrest recently; Manzi testified that they had not spoken about the arrest, while Sansom admitted talking about the arrest on the very morning that the pair testified. These inconsistencies were rendered immaterial by the short playing time of the tape, which seemed to provide overwhelming corroboration of the fundamental story told by Manzi and Sansom.

Manzi and Sansom testified consistently with each other—and with the playing time of the tape—on one important issue: that the chase, arrest of Arroyo and discovery of the firearm happened very quickly. Manzi testified repeatedly that the entire sequence of events lasted only seventeen seconds, indeed seventeen seconds "at the very most." Tr. Nov. 3, 2003. Sansom agreed that the entire incident "happened within a few seconds." *Id.* at 177. Sansom parked, got out of the car, went inside and was told to handcuff Arroyo "all within a matter of seconds." *Id.*

Both Manzi and Sansom listened to the audiotape of police radio transmissions in preparation for their trial testimony, *id.* at 45, 168, so both were necessarily aware of the brief lapse of time reflected between events on that tape. Manzi believed that the tape reflected the actual timing of events, *id.* at 115–16, and the two officers discussed the case the morning of their testimony.

Manzi was the only prosecution witness who could testify about what happened inside the Silver Dollar Café, where Arroyo was arrested and the gun was discovered. Accordingly, his credibility was essential to the government's case. Manzi's testimony that he immediately chased the guy in a white shirt into the Silver Dollar, maintained eye contact with him until he disappeared into the women's bathroom, then apprehended Arroyo on his way out of the tiny bathroom where the weapon was later discovered, offers strong evidence that Arroyo was the guy in a white shirt who left a gun in the bathroom. Manzi's version of events was supported, indirectly, by Sansom's testimony that he went in right after Manzi and, as Sansom entered the bar, "Manzi had a hold of the defendant, gave him a quick pat-down and said 'Secure him.'" *Id.* at 156. It was also supported by Foster's testimony that,

when he entered the Silver Dollar, Arroyo was being handcuffed *id.* at 30, because the elapsed playing time on the tape showed Foster arriving outside the Silver Dollar only twenty-five seconds after Manzi bailed out.

This sequence was contradicted by Gonzalez's testimony that the police were in the Silver Dollar for three or four minutes before seizing Arroyo. More significantly, perhaps, Manzi's testimony was called into doubt by Foster's testimony. First, Foster testified that his official police reports indicates that Manzi had told him that night that Manzi "had seen Mr. Arroyo exiting the ladies room and walking quickly towards the bar." Tr. Nov. 4, 2003 at 31. Finally, Foster testified that he knew Arroyo's half-brother, Maldonado, and that Maldonado was seated at the bar in the Silver Dollar when Foster arrived. Because Manzi and Sansom testified that Maldonado was outside in the street when they entered the Silver Dollar, Maldonado's presence was inconsistent with the sequence of events described by Manzi and Sansom.

In sum, at the close of the evidence, this case had boiled down to a credibility battle between Manzi and Gonzalez. Manzi's credibility had been undercut by inconsistencies among the testimony of the responding officers and by his prior inconsistent statements about the critical events at issue. Gonzalez's credibility had been undercut by his reported failure to observe a knife fight, his testimony that the only disturbance at the bar had been 30 or 40 minutes prior to the arrival of the police, and the fact that he was a good friend of Arroyo's who did not want to see him go to jail. The obvious way to win this credibility battle was to turn to the only objective, seemingly incontrovertible, evidence in the case: the audiotape. This is precisely what the prosecutor did in closing.

The tape, which had been played several times during trial, was played again early in the government's closing argument. No caution was ever given to the jury that the tape was not real time,[2] so, like a document showing no redactions, its mere presentation to the jury gave rise to a natural inference that nothing had been omitted. Thus, the tape seemingly showed what really happened when, and it showed the jury should believe Manzi, not Gonzalez. The government argued that the time reflected by the tape was consistent with the testimony of Manzi and Sansom, Tr. Nov. 4, 2003 at 136, 140–41, 142–43, and was inconsistent with the testimony of Gonzalez. *Id.* at 137, 150. Because of the tape, the government could argue that "we *know* a very short period of time was involved.... Consider that when you are considering to what extent there may be variations in the testimony." *Id.* at 145 (emphasis supplied). "[T]he part [of the tape] I played, that was real time, and how much time was it? And that is important." *Id.* at 168–69.

Indeed, it was important. But for the existence of a tape purportedly representing a real-time recording of events, the government probably would have been unable to meet its burden to prove guilt beyond a reasonable doubt, resulting in Arroyo's acquittal. Yet two days after the jury's verdict, that critical piece of evidence was shown to be other than what the jury was told.

The significance of the fact that the tape is not real time can hardly be overstated. We now know that the events Manzi testified took seventeen seconds, and that the tape suggested took no more than thirty-six seconds, actually took two minutes nine seconds. We now know that Foster arrived while Arroyo was being handcuffed, but that was actually a minute and seventeen seconds, not twenty-five seconds, af-

---

2. The prosecutor believed in good faith that the tape was a real-time recording.

ter Manzi bailed out of his police cruiser. We now know that Manzi and Sansom were in the Silver Dollar for two minutes and forty-five seconds before radioing that they found a gun—a period of time much closer to Gonzalez's estimate than to Manzi's.

Had the jury known the truth about the tape, and thus how inaccurate was Manzi's testimony about the sequence and timing of events, it would have had "a tremendous impact on the jury's credibility assessment of the witness[es]." *United States v. Wallach*, 935 F.2d 445, 458 (2d Cir.1991) (citing *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir.1975) (although prosecutor had no reason to know that witness' testimony was untruthful when given, court of appeals reversed defendant's conviction)). The Second Circuit has held that "a witness's credibility could very well [be] a factor of central importance to the jury, indeed every bit as important as the factual elements of the crime itself." *United States v. Stofsky*, 527 F.2d at 246. The credibility of Manzi, Sansom and Gonzalez was certainly of central importance in this case.

The existence of proof that the tape was not real time would have affected not only the jurors' view of credibility, but also their view of the factual elements of the government's case. Simply put, the timetable of actual events demonstrates that the incident could not have occurred as Manzi and Sansom testified it did. Nearly two minutes not accounted for by Manzi must be added to the time of the pursuit and capture of Arroyo; even accepting Foster's testimony that he arrived as Arroyo was being handcuffed, at least one minute must be added to the time set forth in Manzi's testimony. Thus, there were one or two minutes when the officers may not have pursued the man in white, or when Manzi may have lost visual contact with the man in white, or when others (including Maldonado) may have entered or left the premises, or when the officers may have been walking around inside the bar, as Gonzalez testified they did. If the jury realized that events did not occur as Manzi and Sansom testified, the jury probably would have rejected their testimony in other respects—including that the officers recognized Arroyo as the man they saw holding the gun.

I conclude that, had the jury been aware that the tape was not a real-time recording of events—and thus that Manzi testified inaccurately when he recounted the timing of his and Arroyo's actions, it probably would have acquitted Arroyo. Manzi's inaccurate testimony regarding his pursuit and arrest of Arroyo "directly calls into question the veracity of the rest of his statements. [Manzi's] testimony was essential to the government's case; indeed, he tied all the pieces together.... Moreover, the government through its ... closing argument made much of" the fact that the time reflected by the tape proved Manzi was telling the truth. *United States v. Wallach*, 935 F.2d at 458–59.[3] Under all the circumstances, it would be a manifest injustice to let the guilty verdict stand.

### CONCLUSION

For the foregoing reasons, the amended motion for a new trial (doc. # 35) is granted.

It is so ordered.

---

**3.** Although *Wallach* involved a case of perjured testimony, it is not necessary for me to determine whether or not Manzi perjured himself. Manzi's testimony about material facts was fundamentally false or inaccurate, so the reasoning set forth in *Wallach* applies fully here.